**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: ALIGHT, INC. SECURITIES LITIGATION | Case No. 1:26-cv-02924<br><br>CLASS ACTION<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. JURISDICTION AND VENUE ..... 7

III. PARTIES AND RELEVANT NON-PARTIES ..... 8

A. Plaintiffs ..... 8

B. Defendants ..... 8

C. Relevant Non-Parties ..... 10

D. Confidential Witness ..... 10

IV. BACKGROUND ..... 11

A. Company Background ..... 11

B. Background Of Alight's Employer Solutions Segment ..... 12

C. Background Of Alight's Professional Services Segment ..... 14

D. Alight Migrates Its Employer Solutions Business To A Cloud-Based Model ..... 15

E. Alight Divests Its Professional Services Segment ..... 16

F. Alight Names Dave Guilmette As Chief Executive Officer ..... 19

G. Alight Announces Positive Financial Results And Misleadingly Promises Future Growth ..... 21

H. Undisclosed Operational And Execution Issues Following The Company's Cloud Migration And Divestiture Prevents Alight From Achieving The Financial Growth Defendants Promised ..... 24

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..... 27

A. November 12, 2024 Statements ..... 27

B. December 4, 2024 Statements ..... 34

C. February 20, 2025 Statements ..... 38

D. February 27, 2025 Statements ..... 47

E. March 20, 2025 Statements ..... 48

F. May 8, 2025 Statements ..... 54

G. May 14, 2025 Statements ..... 58

VI. A PARTIAL CORRECTIVE DISCLOSURE INCREMENTALLY REVEALED THE FRAUD WHILE DEFENDANTS CONTINUED TO MAKE FALSE AND MISLEADING STATEMENTS ..... 61

A. August 5, 2025 Statements And Partial Disclosures ..... 61

B. Defendants Continue To Mislead Investors With September 4, 2025 Statements ..... 69

C. Defendants Continue To Mislead Investors With November 5, 2025 Statements ..... 74

D. Defendants Continue To Mislead Investors With December 2, 2025 Statements ..... 79

VII. THE TRUTH IS FINALLY DISCLOSED TO INVESTORS ..... 81

VIII. ADDITIONAL SCIENTER ALLEGATIONS ..... 87

A. *Respondeat Superior* and Agency Principles Apply ..... 88

B. The Individual Defendants Had Access To Material Information That Their Statements Were False Or Misleading ..... 89

C. The Fraud Implicated Alight's Core Operations ..... 91

D. Defendants' Financial and Health-Solutions Based Experience ..... 93

E. The Individual Defendants' Compensation Structure Supports Scienter ..... 94

F. The Sudden Departures of the Company's CEO and CFO Support a Strong Inference of Scienter ..... 95

G. The Temporal Proximity Between Defendants' Misstatements And The Relevant Truth Bolsters Scienter ..... 97

IX. NO SAFE HARBOR ..... 98

X. LOSS CAUSATION/ECONOMIC LOSS ..... 100

XI. CLASS ACTION ALLEGATIONS ..... 102

XII. CONTROL PERSON LIABILITY ..... 104

XIII. PRESUMPTION OF RELIANCE; FRAUD ON THE MARKET ..... 105

XIV. CAUSES OF ACTION ..... 106

PRAYER FOR RELIEF ..... 111

JURY TRIAL DEMAND ..... 111

Lead Plaintiff Mushtaq Pyaru and Plaintiff Warren Police and Fire Retirement System ("Plaintiffs"), individually and on behalf themselves and all persons who purchased Alight, Inc. ("Alight" or the "Company") common stock from November 12, 2024 through February 18, 2026, inclusive (the "Class Period"), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters. Plaintiffs' information and belief is based on the substantial investigation by Plaintiffs' counsel into the facts and circumstances alleged herein, including the following: (i) a review and analysis of public filings referenced herein made by Alight with the United States Securities and Exchange Commission ("SEC"); (ii) a review and analysis of press releases, analyst reports, public statements, news articles, and other publications referenced herein disseminated by or concerning Alight and Defendants Dave Guilmette ("Guilmette") and Jeremy Heaton ("Heaton") named herein, including the dissemination of information on the Internet; (iii) a review and analysis of Company conference calls, press conferences, and related statements and other materials referenced herein; (iv) a review and analysis of those other documents referenced herein; and (v) interview with a confidential witness ("CW") who was a former employee of Alight. Many additional facts supporting the allegations are known only to Defendants and/or are within their exclusive custody or control. Plaintiffs believe that substantial additional evidentiary support for the allegations will emerge after a reasonable opportunity to conduct discovery.

## I. INTRODUCTION

1. Alight is an information technology and consulting company focused on employee management products for businesses. This case concerns a straightforward effort by Defendants to intentionally misrepresent the success of Alight's failing initiative to modernize the Company's most important business segment, its Employer Solutions business. The

modernization included migrating its services to a cloud-based system and relying more heavily on AI to cut costs.

2. During the Class Period, when making required SEC disclosures and other disclosures to investors, Defendants repeatedly concealed major execution and operational deficiencies that arose as these initiatives were being implemented.

3. For years, Alight operated through two core reporting segments: Employer Solutions and Professional Services. In 2020, Alight embarked on a strategic initiative to transform its Employer Solutions segment by migrating its legacy, on-premises technology to a cloud-based platform. Defendants represented to the market that this would enable the Company to deliver a superior customer experience and increase sales and revenues, while lowering costs.

4. Then on March 20, 2024, the Company announced that it had agreed to sell its Professional Services segment, together with its payroll and human capital management outsourcing business to a private equity firm. The Divestiture was intended to complement the Company's shift towards a more advanced and focused Alight Worklife® platform, allowing the Company to concentrate exclusively on its benefits administration and technology platform business while expanding the use of automation and AI across client support, implementation, and call center operations.

5. The Company had an overly euphoric vision of the promise of AI telling the market the following:

> Our vast data lake creates a proprietary advantage that enables predictive end-to-end orchestration when implementing AI, which will allow us to transform employee experiences into proactive life journeys, driving better outcomes for employers, employees and their families.[1]

---

[1] *See* Alight, Inc., Q4 2025 Earnings Call, 5 (Feb. 19, 2026) (S&P Global transcript)

6. It appears that management wanted to work toward all this with the added bonus of never having to talk to an actual human employee! Apparently, unbeknownst to investors, Alight's ultimate goal was to let the computers do as much as possible, with as little human guidance as possible. This was a fundamentally flawed plan for a services company dealing with humans who had a critical need for healthcare in a complex health care system. As the plan fell apart for lack of "execution," Defendants felt compelled to misrepresent the true state of affairs in order to preserve their large performance-based bonuses, as well as their jobs.

7. The end users of Alight's new cloud-based AI system – its customers and potential new customers – did not have such a rosy view of Alight's world of AI customer service. Trustpilot is a consumer business that operates a website hosting reviews of businesses worldwide. As of June 2025, Trustpilot hosts 330 million reviews. *See* Trustpilot – Wikipedia, https://en.wikipedia.org/wiki/Trustpilot (last visited Aug. 6, 2026). Alight earned a score of 1.1, the lowest score possible except for pure 1.0.

8. Below are two images from actual consumer reviews from the class period regarding Alight:


AM Andrew M
AU • 4 reviews
Feb 6, 2026

**Worst company in history, please help get all their contracts terminated**

This company needs to be put out of business. Look at the reviews, they are the worst on trustpilot. They fail in every way imaginable and take shortcuts to make themselves more money at the cost of those they are supposed to service. This company should be allowed to continue to profit like this from such abysmal execution. We NEED TO GET THIS COMPANY DELETED , SPREAD THE HATE TOWARD ALIGHT

February 5, 2026 Unprompted review

**Stephanie Allen**
US • 1 review

Jan 13, 2026

**NO CUSTOMER SERVICE!**

Their customer service is beyond horrible, it's completely nonexistent!! I have been trying to reach them for 3 months to rollover my retirement benefits to an IRA which is a time sensitive issue and still haven't gotten in touch with them 🙃

January 13, 2026 Unprompted review

9. Trustpilot is actually well suited to the use of AI. Human's lives are not dependent on it, and it does not have to accurately comprehend complex human health issues as they relate to a complex medical employee benefit systems. The AI at Trustpilot generated the overall review of Alight depicted below (stating, among other things, that customers frequently report extremely poor customer service):

**Review summary**

Created with AI, based on recent reviews

Evaluating 93 reviews, most reviewers were let down by their experience overall. Customers frequently report extremely poor customer service, with many finding representatives unhelpful, difficult to understand, and often providing inconsistent or incorrect information. Reviewers also faced significant challenges in contacting the company, experiencing excessively long wait times and difficulties reaching knowledgeable staff to address their concerns.

People often experienced issues with service delivery, including lost paperwork, unprocessed requests, and critical delays in handling benefits or retirement funds. Many also noted a lack of accountability, with managers failing to return calls and problems remaining unresolved despite multiple attempts to seek assistance. This often led to frustration and wasted time for customers.

See less

10. During the Class Period, Defendants provided overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of Alight's growth

potential and financial stability; notably, that the Company was not truly equipped to execute on its claimed potential and could not maintain its promised dividend as a result. Throughout the Class Period, Defendants announced disappointing results, reduced projections, and multiple goodwill impairments all while telling investors they remained confident in their ability to execute, drive growth, and continue to provide a dividend to their shareholders. Such statements absent these material facts caused Plaintiffs and other shareholders to purchase Alight's securities at artificially inflated prices.

11. Investors began to question the veracity of Defendants' public statements on August 5, 2025, during Alight's second quarter earnings report. In pertinent part, Defendants announced disappointing results and cut their revenue guidance for the year, resetting investor expectations. Defendants highlighted both a slowdown annual recurring revenue ("ARR") bookings and a worsening decline of project revenue than previously projected. Pertinently, Defendants pointed partially to macroeconomic uncertainty, though they had previously minimized such impact in just the prior quarter, as well as insufficient commercial execution.

12. Investors and analysts reacted immediately to Alight's revelation. The price of Alight's common stock declined dramatically. From a closing market price of $5.13 per share on August 4, 2025, Alight's stock price fell to $4.19 per share on August 5, 2025, a decline of about 18.32% in the span of just a single day.

13. Notwithstanding the August 5 disclosures, Alight and the Individual Defendants continued to mislead investors. Defendants continued to create the false impression that they possessed reliable information pertaining to Alight's execution shortfalls and their ability to turn them around. Defendants deceptively claimed confidence in their ability to meet updated projected targets and slow the decline of the Company's project revenue growth rate while

keeping hiring costs muted and continuing to give back to shareholders through Alight's dividend.

14. During the subsequent November 5, 2025 earnings call, Defendants continued to mislead investors further by failing to disclose additional issues and difficulties arising from Alight's efforts to revitalize its execution, instead trimming guidance while remaining upbeat about prospects, progress, continued execution focus, and the repeated assurance of the quarterly dividend to demonstrate their commitment to investors. Subsequent to the call, ***both of the Individual Defendants were removed from their positions at the Company,*** but Alight did not disclose any clear shortcoming or specific failures leading to their departures.

15. The full truth did not finally emerge until February 19, 2026, when Alight announced a significant earnings shortfall against its prior guidance, alongside further shortfalls for bookings and project revenue growth. Alight's new management noted the Company failed to "meet our internal financial targets and new bookings and renewals did not meet our expectations, leading us to miss our forecast to the market." They pointed the blame significantly on the Individual Defendants' execution and highlighted the new administration would bring "a change in the execution of the company" in order to "driv[e] operational excellence." The new management further cancelled the dividend, noting there are "more efficient . . . capital [allocation activities]," and triggered an earnings shortfall due to "an increase in compensation expense" in order to "promot[e] service quality," and overall improve sales execution.

16. Investors and analysts again reacted promptly to Alight's revelations. The price of Alight's common stock declined dramatically. From a closing market price of $1.31 per share on February 18, 2026, Alight's stock price fell to $0.81 per share on February 19, 2026, a decline of

38% in the span of one day. Notably, the stock had now fallen approximately $6.85, or nearly 90% over the course of the instant class period.

17. The analysts at Citi had been putting faith in the false and misleading statements from defendants more than the hard numbers. After the final disastrous disclosures, they sheepishly admitted that that had been a mistake, and a lesson learned:

> ALIT has met the classic definition of a value trap – positive views on the asset value (scale, partner ecosystem, platform capabilities) countered by an incremental pattern of worsening financial performance. At the very least, a learned lesson now well-ingrained into our practices.

Peter Christiansen, *Value Trap Narrative Tough to Escape; D/G to Neutral/HR - $1.00 TP*, Citi (Feb. 19, 2026) ("Feb. 19 Citi Report").

18. Also after the final disclosure of false or misleading information in this case the view of the analysts for Citi largely coincided with the views of consumers on Trustpilot:

> The incoming management team will need to significantly improve client service (the top reason for rising client attrition), overhaul client front ends and interfaces, and possibly rebase client operations domestically.

Feb. 19 Citi Report. It goes without saying that the incoming management team should avoid creating another value trap, and next time keep investors apprised of the true situation.

## II. JURISDICTION AND VENUE

19. Plaintiffs bring this action, on behalf of themselves and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

20. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

21. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1331.

22. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), as Defendant Alight is headquartered in this District and a substantial part of the conduct complained of herein occurred in this District.

23. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III. PARTIES AND RELEVANT NON-PARTIES

### A. Plaintiffs

24. Lead Plaintiff Mushtaq Pyaru, as set forth in the certifications filed at ECF No. 32-2, incorporated by reference herein, purchased Alight common stock at artificially inflated prices during the Class Period and has been damaged thereby.

25. Plaintiff Warren Police and Fire Retirement System, as set forth in the certification filed at ECF No. 23-2, incorporated by reference herein, purchased Alight common stock at artificially inflated prices during the Class Period and has been damaged thereby.

### B. Defendants

26. Alight, Inc. is a Delaware corporation with its principal executive offices located at 510 Lake Cook Road, Suite 400, Deerfield, Illinois 60015. During the Class Period, the Company's common stock traded on the New York Stock Exchange (the "NYSE") under the ticker symbol "ALIT."

27. Defendant David D. Guilmette ("Guilmette") was, at all relevant times, the Chief Executive Officer ("CEO") and Vice Chair of the Board of Directors of Alight until his departure from the Company on December 31, 2025, as announced by Alight on November 24, 2025. Upon information and belief, Defendant Guilmette either stepped down from his roles as CEO

and Vice Chair or was otherwise effectively forced out due to the issues outlined in this Complaint.

28. Defendant Jeremy J. Heaton ("Heaton") was, at all relevant times, the Chief Financial Officer ("CFO") of Alight until his departure from the Company on January 9, 2026, as announced by Alight on December 18, 2025. Upon information and belief, Defendant Heaton either stepped down from his role as CFO or was effectively forced out due to the issues outlined in this complaint.

29. Defendants Guilmette and Heaton are sometimes referred to herein as the "Individual Defendants." Alight together with the Individual Defendants are referred to herein as the "Defendants."

30. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Alight's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

**C. Relevant Non-Parties**

31. Stephan Scholl served as Alight's CEO from April 2020 to August 2024. Afterwards, he served as a Strategic Advisor for the Company until May 2025. *See* LinkedIn, Stephan Scholl, https://www.linkedin.com/in/stephanscholl/ (last visited Aug. 4, 2026).

32. Rohit Verma serves as Alight's CEO and is a member of the Company's Board of Directors. *Rohit Verma*, Alight, https://www.alight.com/about/leadership/rohit-verma (last visited Aug. 4, 2026). He began his role as CEO of Alight in January 2026, replacing Dave Guilmette.

33. Greg Giometti served as Alight's interim CFO from January 9, 2026, following Heaton's resignation, through May 8, 2026. Previously, Giometti served as the Company's Senior Vice President and Head of Financial Planning & Analysis from October 2023 to January 2026. *See* LinkedIn, https://www.linkedin.com/in/greg-giometti-1b484215/ (last visited Aug. 4, 2026).

**D. Confidential Witness**

34. Confidential Witness One ("CW1") worked for Alight as a Defined Contribution ("DC") Financial Specialist from March 2024 to January 2026. As a DC Financial Specialist, they were a part of a team of 12 specialists who each handled anywhere from 35 to 60 calls from the employees of Alight's customer accounts who had questions regarding their 401(k) retirement plans, specifically regarding how to take distributions and make various transactions related to their plans. The customer company accounts that CW1 handled were all very large companies of more than 5,000 employees. If an employee from Alight's customer account encountered an issue, CW1 would have to either do the transaction for them or walk them through how to do it.

## IV. BACKGROUND

### A. Company Background

35. As noted above, Alight, a Delaware corporation headquartered in Chicago, Illinois, is an information technology and consulting company focused on human capital management solutions.

36. The Company formed on May 1, 2017 when Tempo Acquisition, LLC, a wholly-owned subsidiary of Alight, acquired the technology-enabled human resources ("HR") business of Aon, plc ("Aon"). Alight, Inc., Registration Statement Am. 2 at F-57 (Form S-1/A) (Aug. 23, 2021) ("Reg. Statement Am. 2").

37. Alight went public via a SPAC merger on July 2, 2021, and began trading on the New York Stock Exchange ("NYSE") under ticker symbol "ALIT." Alight Inc., Current Report (Form 8-K) (July 2, 2021).

38. Historically, Alight broke its operating results into three reportable segments: Hosted Business, Employer Solutions, and Professional Services. Alight, Inc., Annual Report 29 (Form 10-K) (Mar. 10, 2022).

39. Alight's Hosted Business segment provided exclusively legacy-based, on-premise HR and benefits administration services to clients who had not yet migrated to cloud-based[2] solutions. Reg. Statement Am. 2 at 7.

40. However, the Company began winding down its Hosted Business in 2021, and removed it from its core operating segments, referring to it as "Other" in its reported revenue in SEC filings, effective January 1, 2023. *See* Alight, Inc., Quarterly Report 7 (Form 10-Q) (May

---

[2] "Cloud-based" refers to the applications, software, services, or data that run on remote internet servers. Vangie Beal, *What Is Cloud-Based?*, Webopedia (May 24, 2021), https://www.webopedia.com/definitions/cloud-based/.

9, 2023). By 2024, the Company had completed the wind-down of the Hosted Business entirely, leaving them with only two reportable segments: Employer Solutions and Payroll & Professional Services. *See* Alight, Inc., Quarterly Report 30 (Form 10-K) (May 8, 2024); *see also* Alight, Inc., Press Release, *Alight Reports Fourth Quarter and Full Year 2024 Results* (Feb. 20, 2025).

**B. Background Of Alight's Employer Solutions Segment**

41. Alight's Employer Solutions segment offers a suite of workforce-related human capital management and talent services for large employers, including benefits administration, healthcare navigation, financial wellbeing, leave management, retiree healthcare, and payroll. Historically, these services were delivered through a combination of legacy, on-premises, and cloud-based offerings. Its reporting unit was Health and Wellness Solutions (later referred to as "Health Solutions" or "Health and Navigation Solutions"), which, under Accounting Standards Codification ("ASC") § 350-20, served as the relevant unit of account for goodwill impairment testing within its Employer Solutions Segment.[3]

42. As of 2020, Alight's *own infrastructure* had not yet migrated to the cloud and remained exclusively legacy-based. Its on-premises services operated through its core product offering called the "UPoint platform," serving as Alight's benefits administration portal, which allowed employees to enroll in and manage health, wealth, and other benefits while integrating that data with employers' HR systems. Its cloud-based business, by contrast, consisted primarily of advisory and implementation services that helped clients migrate their HR systems to third-party cloud platforms such as Workday and SAP SuccessFactors.

[3] A goodwill impairment is a non-cash write-down that occurs when a company determines that the carrying value of a reporting unit—in Alight's case its Health and Wellness Solutions reporting unit, which is within its Employer Solutions segment—exceeds its fair value, requiring the company to reduce the related intangible asset and recognize an impairment loss. *See* FASB Accounting Standards Codification § 350-20 (Am. Inst. of Certified Pub. Accountants 2024).

43. Alight's Employer Solutions business has traditionally accounted for the overwhelming share of the Company's revenue. Its importance is highlighted through the revenue it brings to the Company on a yearly basis. For example, for fiscal year 2021, sales from its Employer Solutions segment represented approximately 85.8% of the Company's total revenue ($2,503 million of Alight's $2,915 million in revenue); for fiscal year 2022, 86.8% ($2,718 million of Alight's $3,132 million in revenue); and for fiscal year 2023, 86.9% ($2,963 million of Alight's $3,410 million in revenue). *See* Alight, Inc., Annual Report 36, 39 (Form 10-K) (Mar. 10, 2022) ("2021 10-K"); Alight, Inc., Annual Report 32, 38 (Form 10-K) (Mar. 1, 2023) ("2022 10-K"); *see also* Alight, Inc., Annual Report35, 36 (Form 10-K) (Feb. 29, 2024) ("2023 10-K").

44. The Company's Employer Solutions segment generates the vast majority of its revenue on a recurring basis "from fees or services provided . . . .based on a contracted fee charged per participant per period . . . . with mutual renewal options." 2023 10-K4. A smaller portion of the revenue is derived from project work such as implementation, migration, and other one-time services.

45. Annual Recurring Revenue ("ARR") refers to the annualized value of revenue from subscription or other continued services.[4] It is "typically longer term in nature and more predictable on an annual basis[.]" 2023 10-K F-11. If customers renew their subscription-based product, ARR increases. If a customer churns or fails to renew, ARR decreases.

46. For context, for fiscal year 2021, 90.4% of Alight's Employer Solutions revenue was recurring ($2,262 million of Alight's $2,503 million in Employer Solutions revenue); for

[4] *See* Corporate Finance Inst., *Annual Recurring Revenue (ARR)*, Apr. 5, 2026, https://corporatefinanceinstitute.com/resources/valuation/annual-recurring-revenue-arr/.

fiscal year 2022, 90.7% ($2,467 million of Alight's $2,718 million in Employer Solutions revenue); and for fiscal year 2023, 90.9% ($2,695 million of Alight's $2,963 million in Employer Solutions revenue). *See* 2021 10-K 39; 2022 10-K 39; 2023 10-K 36.

47. On the whole, recurring revenue for fiscal year 2021 represented 77.6% of the Company's total revenue ($2,262 million of Alight's $2,915 million in total revenue); for fiscal year 2022, 78.7% ($2,467 of Alight's $3,132 million in total revenue); and for fiscal year 2023, 79% ($2,695 of Alight's $3,410 million in total revenue). *See* 2021 10-K 36, 39; 2022 10-K 32, 39; 2023 10-K 35, 36.

**C. Background Of Alight's Professional Services Segment**

48. By contrast, Alight's Professional Services segment provided services such as cloud deployment, consulting, advisory, optimization, and implementation, also for human-capital management and talent systems used by large employers.

49. Alight's Professional Services segment generated most of its revenue from project-based services provided to large employers, with the majority consisting of work that was shorter in duration or delivered on a one-time basis.

50. For the fiscal year 2021, project revenue represented approximately 66.2% of the revenue the Company brought in through its Professional Services segment ($245 million of Alight's $370 million in Professional Services-based revenue); for fiscal year 2022, 65.4% ($243 million of Alight's $371 million in Professional Services revenue); and for fiscal year 2023, 66.3% ($279 million of Alight's $421 million in Professional Services-based revenue). *See* 2021 10-K 40; 2022 10-K 39; 2023 10-K 36.

51. On the whole, project revenue for fiscal year 2021 represented 14.44% of the Company's total revenue ($421 million of Alight's $2,915 million in total revenue); for fiscal

year 2022, 11.8% ($371 million of Alight's $3,132 million in total revenue); and for fiscal year 2023, 5.45 % ($186 million of Alight's $3,410 million in total revenue).

**D. Alight Migrates Its Employer Solutions Business To A Cloud-Based Model**

52. While Alight traditionally operated its own benefits platform through legacy on-premises services, that changed on August 12, 2024, when the Company announced that it had completed, what it later called, "a 4-year technology journey" to migrate its platform off its own physical Lincolnshire Data Center and onto Amazon Web Services ("AWS"), thereby making its Employer Solutions platform exclusively cloud-based as part of an effort to modernize its platform (the "Cloud Migration").

53. The Company's Cloud Migration led to the emergence of Alight Worklife®,which replaced the legacy UPoint platform as the Company's flagship offering through which it provided its cloud-based Employer Solutions-related services. Alight Worklife® is a mobile-first, modular cloud platform that supports Alight's Business Process as a Service[5] ("BPaaS") delivery model by integrating HR, benefits, payroll, health, wealth, and leave administration into a single system through automation and artificial intelligence ("AI").

54. This initiative had massive financial and operational implications for its Employer Solutions business and the Company at large. For example, in the press release announcing the completion of Alight's "cloud migration transformation," the Company announced that it would "achieve $75 million in annualized savings" and "result[] in a simplified and more efficient

[5] BPaaS refers to the cloud-based delivery model through which the Company uses Alight Worklife® to provide human resources, benefits, and payroll services. BPaaS supports Alight's recurring revenue because it is generally delivered through subscription-based, ongoing service relationships with employers and large enterprise clients. While BPaaS revenue is usually recurring in nature, it can also include variable, transactional, or project-based components such as short-term implementation add-ons or usage surcharges that fall outside the scope of ARR, meaning BPaaS revenue will not always be the same as ARR.

Alight Worklife® platform," which included "a 40% reduction in the number of servers[,] a 60% reduction in middleware systems. . . . a 43% faster average response time across Health Enrollment pages[,] a 30% faster average load time for the Alight Worklife homepage. . . . [and] an 85% increase in the adoption of security controls . . . ."

55. Company leadership expressed enthusiasm for the Cloud Migration with Alight's President Greg Goff stating, in relevant part:

> By completing our cloud migration during the first half of 2024, we are well positioned to deliver enhanced performance and increased capacity across the Alight Worklife platform . . . . These investments are driving an all-important enhanced user experience which is critical in advancing how we serve our clients and their people.

56. Given the magnitude of the Company's Cloud Migration, it was critical to the Company's financial well-being and future success that the initiative be implemented effectively, which necessarily required "sales momentum and operational execution[.]" It also required the successful transition of customers and their data from legacy systems to its new automated platforms like Alight Worklife.

57. Indeed, as the Company warned, a successful Cloud Migration would require it to execute complex client migrations from legacy systems to its Worklife platform, while continuing to invest in its technology and service delivery capabilities. Alight also warned that failures or delays in implementation, or an inability to effectively manage the Cloud Migration, could adversely affect client satisfaction, financial results, and margins, particularly as the Company shifts toward a more recurring, platform-based revenue model.

**E. Alight Divests Its Professional Services Segment**

58. As part of its Cloud Migration initiative, on March 20, 2024, the Company announced that it had agreed to sell its Professional Services segment, together with its payroll and human capital management outsourcing business within its Employer Solutions segment, to

private equity firm H.I.G. Capital for up to approximately $1.2 billion. *See* Alight, Inc., Press Release, *Alight Announces Agreement to Sell Payroll and Professional Services Business for Up To $1.2 Billion* (Mar. 20, 2024).

59. The sale completely divested Alight of its Professional Services segment[6]—the primary source of its project-based revenue—and a substantial portion of its largest operating segment, Employer Solutions (the "Divestiture"). The Divestiture made Alight Worklife®, the Company's standalone Employer Solutions platform.

60. The Divestiture was intended to complement the Company's shift towards a more advanced and focused Alight Worklife® platform by allowing the Company to concentrate exclusively on its benefits administration and technology platform business while expanding the use of automation and AI across client support, implementation, and call center operations. As the Company explained in a press release:

> The transaction is a pivotal step, accelerating Alight's evolution into a more simplified and focused employee wellbeing and benefits platform company. The Alight Worklife® platform is optimally positioned to help clients enhance employee engagement and achieve cost savings through advanced solutions. By concentrating resources on strengthening its platform, service capabilities, and go-to-market strategy, Alight will be even better positioned to drive improved cost, experience and productivity outcomes for its clients.
>
> . . .
>
> "This strategic transaction results in a more agile Alight and enhances our competitiveness as we strengthen our technology and services value proposition," said Chief Executive Officer, Stephan Scholl.
>
> "Coupling our strategic partnership with the Payroll & Professional Services business alongside our strong benefits business, delivery capabilities, data analytics, and artificial intelligence will ensure prospective and new clients

---

[6] Alight's divested Professional Services business was rebranded under the name "Strada" and now operates as a separate company focused on payroll and human capital solutions, owned and operated by H.I.G. Capital. *See* H.I.G. Capital, *Strada - H.I.G. Capital Portfolio Company*, https://hig.com/portfolio/strada/ (last visited Aug. 5, 2026).

> remain on the frontier for wellbeing and benefits solutions. With today's announcement, we believe the stage is set for Alight to unlock the power of its platform transformation and deliver world-class, innovative solutions that improve client outcomes and enhance shareholder value."

61. Additionally, Defendants acknowledged that the shift away from its Professional Services business would initially result in lower near-term revenue and a reduction in project-based work. However, Defendants assured investors that a greater focus on Employer Solutions would create a more streamlined, recurring-revenue business with stronger margins and greater competitiveness. Defendants said that focusing on its Employer Solutions segment, its proportion of recurring revenue would increase from 84% to over 90% and improve the Company's margin profile by nearly 300 basis points.

62. For example, on May 8, 2024, at Alight's earnings call for Q1 2024 (the "Q1 2024 Earnings Call") then-CEO, Stephan Scholl explained that by "not having [project-based revenue] as part of [the Company's] portfolio as [it] head[s] into the back half of the year is going to be really helpful in building a more credible backlog of business with a much higher percentage of recurring revenue as part of the baseline, so much less volatility." *See* Alight, Inc., Q1 2024 Earnings Call, 12 (May 8, 2024) (S&P Global transcript).

63. Scholl further stated that 2024 would be a "tale of 2 halves, with the first half adversely impacted by the timing of large deal go-lives, lower nonrecurring project revenue across both segments and the exit from the Hosted business" and "[t]he second half will benefit from an increase in new deal go-lives for which we have *high visibility today* as we continue to build the book of revenue under contract . . . ."

64. At the same earnings call, Scholl issued the following "midterm outlook" based on "the great progress [the Company] ha[s] made to date":

> [R]evenue growth of 4% to 6%, BPaaS revenue growth of at least 15% and adjusted EBITDA margin of 28%, which would mark a total of 600 basis points of margin improvement versus 2023. This will be complemented by a stronger balance sheet, including net leverage below 3x, enhanced cash flow generation and an investor-friendly capital allocation framework supported by $248 million of authorized funding for share buybacks.

65. "EBITDA"[7] measures a Company's operating performance by looking at its earnings before certain non-cash expenses such as interest, taxes, depreciation, and amortization. Alight reports "adjusted EBITDA", which it explains in SEC filings is EBITDA adjusted for the impact of certain non-cash and other items, including goodwill impairments that the Company does not consider in the evaluation of ongoing operational performance. By setting an adjusted EBITDA target of 28%,[8] Alight was conveying to the market that it expected strong margins through cost containment and improved operating efficiency. Investopedia, *EBITDA: Definition, Calculation Formulas, History, and Criticisms*, https://www.investopedia.com/terms/e/ebitda.asp (last visited June 29, 2026).

66. Analysts likewise "view[ed] th[e] transaction positively as it create[d] a company with a higher level of recurring revenue, higher margins, and lower net leverage." As a result, Alight was given a "buy" rating. Peter Heckmann, Allison Heckmann, *Divestiture of Payroll & Prof Services Viewed Positively*, D.A. Davidson (Mar. 20, 2024).

**F. Alight Names Dave Guilmette As Chief Executive Officer**

67. Part of effectively implementing Alight's Cloud Migration and Divestiture to ensure the Company's steady growth, as one analyst put it, also included hiring "a new CEO

---

7 "EBITDA" is the acronym for earnings before interest, taxes, depreciation, and amortization.

8 This means that after covering operating costs, the Company would retain 28% of its revenue, which is considered "excellent" or "premium valuation territory." Nathan Latka, *EBITDA Marginfor SaaS: What It Is & Why Investors Care***,** Founderpath, Mar. 3, 2026, https://founderpath.com/blog/ebitda-margin.

with benefits industry experience and who's comfortable with technology[.]" Remy Samuels, *Alight CEO Plans to Step Down After Firm Appoints Successor*, PlanAdviser (Aug. 6, 2024), https://www.planadviser.com/alight-ceo-plans-step-firm-appoints-successor/.

68. Consequently, on August 26, 2024, Alight announced that it was hiring Dave Guilmette as Alight's Chief Executive Officer, replacing Scholl, who previously served as the Company's CEO for the preceding four years. Alight, Inc., Press Release, *Alight Names Dave Guilmette As Chief Executive Officer* (Aug. 26, 2024).

69. The Company expressed excitement over Guilmette's hiring and said they "[we]re confident in Dave's ability to jumpstart Alight's next chapter following the completion of significant milestones including the technology transformation and divestiture of the Payroll & Professional Services business."

70. Guilmette likewise displayed enthusiasm for his vision for Alight, providing that the Company's:

> technology transformation and recent divestiture have laid the groundwork for us to emerge as a much stronger company with a significantly improved financial profile. I know Alight's colleagues are intensely focused and inspired by the opportunity to partner with our clients to deliver success for them and their people. Working closely with our executive team and Board of Directors, I already see many opportunities for us to move even faster in addressing these evolving client needs and reorienting around technology-rich services that enhance our competitiveness and deliver even more value for Alight's clients.

71. On the first day of the Class Period, at the Company's earnings call for Q3 2024 (the "Q3 2024 Earnings Call") held on November 12, 2024, Guilmette pointed to his "past 40-plus years in this industry, supporting large employer health care and employee benefit programs" as a basis for his "familiarity with Alight, the market [it] serve[d,] and [his] excit[ement] [for the] opportunity ahead." *See* Alight, Inc., Q3 2024 Earnings Call, 3 (Nov. 12, 2024) (S&P Global transcript).

72. Guilmette also touted the return of Alight's previously departed clients, its "focus on ARR . . . driving a greater mix of long-term contracts being signed," and the Company's commencement of a dividend program with a "quarterly dividend of $0.04 per share beginning in the fourth quarter."

73. A dividend is a distribution of a company's earnings to its shareholders. If a company issues a dividend, it has the financial flexibility to return a portion of profits to shareholders while continuing to fund operations and meet other obligations. Accordingly, the Company's commitment to a dividend program that would issue regular quarterly dividends of $0.04 signaled to investors that the Cloud Migration and Divestiture was progressing successfully and would continue to do so, reflecting "confidence in [the Company's] return to growth alongside strong cash flow and a healthy balance sheet."

74. Guilmette also acknowledged the short-term impact of the Company's Divestiture but assured investors that he "fe[lt] really strong[] about 2025 being a better year," for Alight with "margins . . . expect[ed] to improve" because it was "on solid footing with a number of [its] large enterprise clients . . . ."

### G. Alight Announces Positive Financial Results And Misleadingly Promises Future Growth

75. Initially, the Cloud Migration and Divestiture yielded positive financial results for Alight. For example, at the Company's Q3 2024 Earnings Call, Defendants announced that "[r]ecurring revenue growth improved sequentially and the solutions we categorize as BPaaS revenue were up 19% from the prior year" while "[m]obile enrollments are up 35% compared to the prior year" and "adjusted EBITDA margin was 21.3% which is up 90 basis points from the prior year . . . ."

76. Capitalizing on the momentum brought on from this positive news, Defendants further assured investors that these results were not an isolated occurrence, explaining that "[b]etween our pipeline win rates and revenue under contract, we are on the path back to sustainable profitable growth . . . ."

77. Indeed, during the Class Period, Defendants explained that the Company was "well positioned" to effectively implement the Cloud Migration and Divestiture and that, as a result, it would continue to drive growth across various financial metrics. For example, on March 20, 2025, in Alight's 2025 Investor's Day press release, Guilmette explained:

> By nailing the basics with our clients every day and leveraging our transformed technology platform to empower the next wave of innovation, we believe we are well positioned to accelerate our financial performance and deliver long-term shareholder value.

Alight, Inc., Press Release, *Alight Introduces Mid-Term Targets At Investor Day* (Mar. 20, 2025).

78. Into 2025, with the Cloud Migration completed in 2024, Guilmette assured investors that it would now deliver the operational and financial benefits in the years to come, as the Company had promised:

> Whenever you do something that's material like [a cloud migration], you're going to have some that might look at that with some angst. And so I feel really good about the stability of our technology platform now. I feel really good about the leadership changes that we've made and the focus on client management and the focus on excellent service delivery. And we're making progress, and I think we're effectively reestablishing that level of confidence that our clients should have in us that we've been able to demonstrate over the course of several decades.

*See* Alight, Inc., Q4 2024 Earnings Call, 14 (Feb. 20, 2025) (S&P Global transcript).

79. During the Investor Day presentation, Heaton touched on why Alight expected to see continued growth, explaining that "there's going to be an inflection point in [the Company's] growth into the second half [of 2025] with low to mid-single-digit growth in the second half with

continued execution and the momentum that we're seeing today." *See* Alight, Inc., Analyst/Investor Day 27 (Mar. 20, 2025) (S&P Global transcript).

80. At the same presentation, Alight quantified that outlook, projecting total revenue of $2,318–$2,388 million; recurring revenue growth of 1% at the midpoint; adjusted EBITDA of $620–$645 million (or 26.7 to 27.0%); adjusted EPS[9] of $0.58–$0.64; and free cash flow of $250–$285 million.[10]

81. The Company explicitly tied those projections to "[i]ncremental ARR from new wins & improved retention…"; "[m]argin expansion…from cloud migration & productivity initiatives"; and a "simplified business model requiring less working capital and Capex."[11]

82. Looking forward, the Company projected "500 bps of additional margin expansion through 2027" meaning that the Company expected its profit margin to increase by 5.0 percentage points, all of which was said to be driven by Alight's "[t]echnology and organizational transformation," delivery operating model, and "Call Center AI & Automation"

83. Later on, at the Company's earnings call for Q1 2025 (the "Q1 2025 Earnings Call"), Heaton touted the "steps forward, both strategically and financially" that the Company took "towards [its] midterm objectives" in 2025, which he called Alight's "transitional year . . .

---

[9] "EPS" or "Earnings Per Share" is used to estimate the value of a company by dividing a company's expected net profit by the number of its outstanding common shares. Because revenue and operating expenses drive net profit, it ultimately determines a Company's EPS.

[10] In the press release described in ¶77, the Company provided the following mid-term financial outlook: "[t]otal annual revenue growth rate of 4-6% by 2027[,] Adjusted EBITDA margin of approximately 30% by 2027 [, and] Cumulative free cash flow of approximately $1 billion between 2025 and 2027."

[11] "Capex" or "Capital Expenditures" refer to the amount a company spends on long-term assets to improve efficiency and expand operational capacity. HSBC, *What Are Capital Expenditures?*, May 6, 2025, https://www.business.hsbc.uk/en-gb/insights/growing-a-business/what-are-capital-expenditures.

." Heaton attributed this in part to Alight's "intense[] focus[] on securing the remaining renewals in this cycle and its commercial execution across both recurring and project revenue." Alight, Inc., Q1 2025 Earnings Call, 12 (May 10, 2025) (S&P Global transcript).

84. Based on these representations, Defendants "reaffirm[ed] [its previous] outlook for 2025" and issued the following "[f]ull year expectations":

> [R]evenue of approximately $2.32 billion to $2.39 billion or negative 1.5% to positive 1.5% growth. Adjusted EBITDA of $620 million to $645 million, adjusted EPS of $0.58 to $0.64, which does not include any impact from share buybacks, and free cash flow of $250 million to $285 million or growth of 13% to 29%.

### H. Undisclosed Operational And Execution Issues Following The Company's Cloud Migration And Divestiture Prevents Alight From Achieving The Financial Growth Defendants Promised

85. Unbeknownst to investors, however, Defendants' representations during the Class Period were materially false and misleading when made because Defendants knew, or recklessly disregarded, that the Cloud Migration and Divestiture was not positioning Alight for financial success as represented because undisclosed, ongoing operational and execution issues prevented these initiatives from delivering the growth Defendants had represented to the market. These undisclosed material issues prevented Alight from meeting the Company's revised projected targets and from supporting sustainable ARR growth, and instead caused multiple massive goodwill impairments, caused the declines in project-based revenue, ARR, adjusted EBITDA, and adjusted EPS, increased the Company's hiring costs, and impaired the Company's ability to consistently return capital to shareholders through Alight's dividend.

86. Accounts tied to the Company's Cloud Migration expansion opportunities within its existing client base, on both a project and recurring basis, were taking longer to close than they had historically. These material deficiencies that arose due to the Cloud Migration expansion were not revealed to investors at the time. Defendants would later admit, this

persisted "through the first half" of 2025, delaying project start dates and thereby pushing ARR beyond the periods in which Defendants had represented the resulting revenue growth would be realized.

87. Moreover, the Company was failing to renew expiring accounts for its updated cloud-based platform among existing customers following the Cloud Migration and Divestiture.

88. The Company also was failing to close new accounts with new customers or bring in new client accounts (referred to by Defendants as "logo"), because the cloud-based system Defendants touted was a disaster for several reasons and clients and potential clients were not interested in the much-touted transition due to numerous problems and lack of support from Alight.

89. For example, CW1 explained that most of the Company's financial specialists received "subpar training" and guidance. And for the employees who were experienced, CW1 explained that they were "leaving like crazy."

90. Additionally, Guilmette—Alight's CEO, who was touted as the "leader to guide Alight as it moves forward as a simplified platform company"—abruptly announced on November 24, 2025, that he was stepping down from his position, effective December 31, 2025.

91. A mere three weeks later, the Company announced that Heaton, the Company's CFO for the past two and a half years, was also leaving Alight, to pursue, somewhat dubiously, "an opportunity outside of the benefits administration industry."

92. Alight's new entirely cloud-based systems, after its Cloud Migration, encountered significant technical issues. CW1 explained that many first-time users struggled with the online application. Indeed, CW1 described the benefits platform as "not user friendly," making it

unintuitive and difficult to navigate. CW1 also stated that users frequently encountered "operator error" and systems that had "errored out."

93. Defendants had touted at the March 20, 2025 Investor Conference that its new cloud-based system and "AI capabilities were the differentiator informed by an unmatched data lake and are expected to drive better client outcomes and deepen our competitive moat" when in fact the AI capabilities were having the opposite impact on customer outcomes driving them away.

94. Because of these undisclosed issues and its impact on Alight finances, the Company later acknowledged that it was taking a noncash goodwill impairment charge of $803 million for its Health and Navigation Solutions reporting unit. *See* Alight, Inc., Q4 2025 Earnings Call, 5 (Feb. 19, 2026) (S&P Global transcript).

95. As Defendants would also later reveal, the issues caused the Company "to reallocate capital in favor of higher return priorities, including investing in the long-term growth of the business, deleveraging and opportunistic share repurchases, which w[ould] replace future dividend payments." An example of this, Verma would later explain, was that when its operational issues arose, the Company "add[ed] more horsepower from a sales management perspective" and was "incentiviz[ing]" employees "for driving execution" leading to "increase[d] . . . compensation expense[s] . . . ." Verma also explained that the Company was planning to "deploy more than $100 million of capital to strengthen the foundations of the business" which necessarily included "investing in [its] client-facing teams by adding sales and account management professionals to increase coverage across [its] client base." Additionally, at the KeyBanc Capital Markets Healthcare Forum on March 18, 2026, Verma reiterated that Alight "made a lot of hires" in Q4 2025 and was "continu[ing] to do" so.

96. Defendants' failure to disclose the adverse facts described herein concerning the Company's internal failures following its Cloud Migration and Divestiture and enhanced AI capabilities prevented the Company from achieving the financial growth Defendants promised to investors. Defendants knew of or recklessly ignored the disastrous cloud and AI roll out but lied to the market that all systems were functioning properly and caused Alight's stock to trade at artificially inflated prices throughout the Class Period. Following a series of corrective disclosures, the price of Alight stock dropped dramatically from a Class Period high of $8.925 per share to less than $0.81 per share by February 19, 2026– a whopping decline of more than 90.94% – causing Class members (defined herein) to suffer hundreds of millions of dollars in financial losses and economic damages under the federal securities laws.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A. November 12, 2024 Statements

97. The Class Period begins on November 12, 2024, when Alight hosted its Q3 2024 Earnings Call, during which Guilmette highlighted his resume and the progress the Company made towards reshaping its business structure, in pertinent part, as follows:

> I've also been impressed with the changes made to our go-to-market structure last year. **We are continuing to see momentum with our focus on growing the breadth and depth of our client base and increasing ARR or annual recurring revenue, which is derived from long-term contracts with high retention.**
>
> We see ARR as a key metric in understanding our top line growth. ***I believe we have the right enterprise sales team integrated with deep domain expertise that is necessary to drive sustainable ARR growth.*** This team recently launched new go-to-market messaging the Alight Benefits Advantage which is already being positively received in the marketplace.
>
> This helps our colleagues be more consistent in describing who we are, what we do, and how and why we do it for clients and prospects alike. With that as a backdrop, I'm pleased to announce key wins in the third quarter with Hewlett Packard Enterprise, Nokia and Siemens. We still expect double-digit ARR

> bookings growth in the second half and ***feel equally good about our forward view on renewal activity.***
>
> ***We're currently in renewal season and overall are in solid standing with our large enterprise relationships.*** I've also seen examples of clients who have left Alight return to us. Why***? Because we are the best in the industry at all facets of this business, from digital through managing benefits complexity.***
>
> The commercial momentum is driven by a number of factors. Better field coverage is driving a deeper pipeline, larger deal sizes and improving win rates. The pipeline itself is up over 60% and win rates are up double digits. ***The focus on ARR is driving a greater mix of long-term contracts being signed.*** Our double-digit ARR bookings guidance is a reflection of this momentum and continued improvement in our execution through the fourth quarter.

98. The statements in boldface referenced in ¶97 were materially false and misleading when made because Defendants failed to disclose and/or misrepresented that the Company was not experiencing momentum in expanding the depth of its client base, and was not on "solid standing with [its] large enterprise relationships" due to having "the right enterprise sales team," and, as a result, did not have "sustainable ARR growth" as represented, because:

(a) the Company was facing significant material undisclosed internal execution deficiencies following its Cloud Migration and Divestiture transition, including delays in closing deals for new and existing business, which delayed project start dates and deferred revenue recognition, as well as difficulties developing its AI-enabled technology, products, and services, both of which created a significant risk that the Company's overall bookings and renewals would decline; and

(b) the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel.

99. Guilmette falsely claimed during this call that the Cloud Migration was "***enabling ongoing savings while also driving an improved user experience***" and, as a result, the Company was "***ahead of [its] guidance***" with "***significant opportunity in front of us to operate even more efficiently.***"

100. The statements referenced in boldface in ¶99 were materially false and misleading when made because Defendants failed to disclose and/or misrepresented the Company's Cloud Migration would not "enabl[e] ongoing savings," drive "an improved user experience" or create an opportunity to "operate even more efficiently," as represented, because:

(a) the Company was facing significant material undisclosed internal execution deficiencies following its Cloud Migration and Divestiture, including delays in closing deals for new and existing business, which delayed project start dates and deferred revenue recognition, as well as difficulties developing its AI-enabled technology, products, and services, both of which created a significant risk that the Company's overall bookings and renewals would decline; and

(b) the Company was facing significant material undisclosed operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel.

101. During the question-and-answer segment of the call that followed the Company presentations, Guilmette characterized the decision to issue a quarterly dividend of $0.04 beginning in the fourth quarter as emblematic of the Defendants' "expectation" and

"commitment" to a "consistent" return of capital to its shareholders, during the following exchange:

> <Q: Kyle David Peterson – Needham & Company, LLC – Senior Analyst> Great. Nice results. Wanted to start off on capital allocation. Obviously, the dividend announcement is new and good to see. How does this change, if at all, your thoughts on potential buybacks, I know that was something post divestiture, you guys have been pretty active on. So how should we think about the balance between dividends and buybacks moving forward?
>
> <A: David D. Guilmette> Kyle, it's Dave. I'll start, and thank you for the question. So look, our position with respect to capital allocation hasn't changed, right? ***Our commitment is to return the capital to our shareholders through a combination of both the new dividend that we've announced today and the share buyback. And so we've got now the capacity to be able to drive both of those***. The dividend is a ***further commitment and we think an expectation for a consistent approach to delivering that capital to our shareholders***. So it's really ***-- based on our confidence in our free cash flow profile and the forward expectations for the business, we feel really good about returning that capital in a variety of ways.***
>
> Jeremy, what would you add?
>
> <A: Jeremy Heaton> I think that's right. We still got the $93 million of capacity, Kyle, which is important. But I think to Dave's point, ***the commitment here, and this was the, I think, the strongest way from our perspective to really commit to that consistency for us moving forward***.

102. The statements referenced in boldface in ¶101 were materially false and misleading when made because Defendants failed to disclose and/or misrepresented that:

(a) the Company was facing significant material undisclosed internal execution deficiencies following its Cloud Migration and Divestiture, including delays in closing deals for new and existing business, which delayed project start dates and deferred revenue recognition, as well as difficulties developing and innovating its AI-enabled technology, products, and services, both of which created a significant risk that the Company's overall bookings and renewals would face substantial declines;

(b) the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel; and

(c) as a result of the foregoing, the Company would need to reinvest its diminished capital to address its operational and execution-based issues and would therefore be unable to maintain its return of capital to shareholders through Alight's announced quarterly dividend program

103. In the accompanying press release, Guilmette touted Alight's execution and capital-return commitment, again highlighting a strong third-quarter performance and the initiation of a quarterly dividend program:

> Alight delivered third quarter results that exceeded our expectations on both revenue and profitability. As the market-leading services provider for employee benefits and wellbeing, Alight is uniquely positioned to guide the world's largest and most complex clients on their people strategy journey. ***The value we now bring as a simplified company is driving momentum in our go-to market strategy and delivering stronger profitability. Our confidence in continued execution, alongside strong cash flow, is enabling a meaningful commitment to capital return, demonstrated by today's initiation of a quarterly dividend program.***

104. The statements referenced in boldface in ¶103 were materially false and misleading when made because Defendants failed to disclose and/or misrepresented that the Company's purported "confident in continued execution," did not exist or was made without any reasonable basis, as represented, because:

(a) the Company was facing significant material undisclosed internal execution deficiencies following its Cloud Migration and Divestiture, including delays in closing deals for new and existing business, which delayed project start dates and

deferred revenue recognition, as well as difficulties developing its AI-enabled technology, products, and services, both of which created a significant risk that the Company's overall bookings and renewals would decline;

(b) the Company was facing significant material undisclosed operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel; and

(c) as a result of the foregoing, the Company would need to reinvest its diminished capital to address its operational and execution-based issues and was therefore unable to maintain its return of capital to shareholders through Alight's announced quarterly dividend program.

105. In the same press release, Defendants announced the Board's approval of a quarterly dividend program and the Company's intent to make regular quarterly dividend payments going forward, stating, in pertinent part:

> The Company announced today that its Board of Directors approved a new quarterly dividend program. The Board of Directors declared a quarterly cash dividend of $0.04 per share to be paid on December 16, 2024 to all stockholders of record as of December 2, 2024. ***The Company intends to continue paying regular cash dividends on a quarterly basis, subject to market conditions and approval by the Board of Directors.***

106. The Company, Guilmette, and Heaton reiterated this on November 12, 2024 in Alight's quarterly report on Form 10-Q for the period ended September 30, 2024 (the "November 12, 2024 Form 10-Q").

107. Defendants Guilmette and Heaton signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that they filed with the SEC in connection with the filing of the

November 12, 2024 Form 10-Q. The certifications state that the annual report "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934[,]" and that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." *See* Exs. 32.1, 32.2 to November 12, 2024 Form 10-Q.

108. The statements referenced in boldface in ¶105 were materially false and misleading when made because Defendants discussed the intention to pay "regular cash dividends on a quarterly basis" while failing to disclose and/or misrepresenting that:

(a) the Company was facing significant material undisclosed internal execution deficiencies following its Cloud Migration and Divestiture, including delays in closing deals for new and existing business, which delayed project start dates and deferred revenue recognition, as well as difficulties developing and innovating its AI-enabled technology, products, and services, both of which created a significant risk that the Company's overall bookings and renewals would face substantial declines;

(b) the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel;

(c) and as a result of the foregoing, the Company would need to reinvest its diminished capital to address its operational and execution-based issues and

therefore the Company was not in a position to maintain its return of capital to shareholders through Alight's announced quarterly dividend program.

**B. December 4, 2024 Statements**

109. On December 4, 2024, during the UBS Global Technology and AI Conference, Heaton, in response to an analyst's question, touted Alight's transformed business following its Cloud Migration and Divestiture by emphasizing its simplified and refocused business that would drive greater efficiency, improved margins and cash flow, stating, in pertinent part:

> <Q: Kevin Damien McVeigh – UBS Investment Bank – Research Division> Very helpful. I think pretty clear. So thank you for that and I guess, with that said, and I think I've done this with every company, we've had for purpose of the audience as well as who's ever kind of online maybe just a little bit about Alight.
>
> You folks have kind of come to the public markets in 2021, and we're fortunate to be part of that process. Maybe talk to the business model, some of the kind of initial strategic overview. And we think you've done a nice job kind of resetting a little bit in terms of selling professional services and the payroll business, but maybe talk to the original like kind of where you are today because we think it's just a critical part. I want to talk about competition, things like that, but maybe we'll start there.
>
> <A: Jeremy J. Heaton> That's great. You're right. So today, Alight is a tech-enabled services company, that delivers mission-critical benefit solutions on behalf of the world's largest, most complex employers across the world. So today, our clients are 50% of the Fortune 500, about 70% of the Fortune 100 and we've been in this business for 4 decades. But you're right, it's been a transformational year for us. We've had 2 key milestones, I would say, that really create the business that we have today.
>
> First is, as you mentioned, the payroll and professional services sale back in July, we closed on it, ***created a simpler and more focused business within the benefit space***, which is really back to the history of who this company is.
>
> And secondly, we just completed a 2-year back-end technology infrastructure program to move into the cloud, which really completes a 4-year technology journey for us. So we've got the Alight Worklife platform on the front end, which serves as a front door for all of our clients. ***And now we've got a seamless one version of technology in the cloud on the back end of the company.***

> ***And so that today for us, allows us to drive a great client experience within the front door, but also sets the stage for margin expansion*** and cash flow ***over the foreseeable future for us.*** So that's really who we are today.

110. Similarly, Heaton touted the Company's "***abl[ity] to accelerate on the journey that [Alight] got now to drive efficiency,***" and, as a result, explained that the Company's "***profile from a margin*** and cash flow ***perspective becomes much more efficient for us in a direct line in the areas that we control today moving forward.***"

111. The statements referenced in boldface in ¶¶109-10 were materially false and misleading when made because Defendants failed to disclose and/or misrepresented that the Company did not have a "simpler and more focused business" or a "seamless . . . version of technology in the cloud" that drove "a great client experience," nor had it "set[] the stage for margin expansion and cash flow," as represented, because:

(a) the Company was facing material significant undisclosed internal execution deficiencies following its Cloud Migration and Divestiture, including delays in closing deals for new and existing business, which delayed project start dates and deferred revenue recognition, as well as difficulties developing its AI-enabled technology, products, and services, both of which created a significant risk that the Company's overall bookings and renewals would face substantial declines; and

(b) the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel.

112. Heaton, at various points throughout the conference, also touted Alight's revamped sales organization, strategic initiatives, and growth outlook, stating, in relevant part:

> Yes. So I'd start, and I'll hit through each of those 3 buckets really, which is the first is we had lower bookings in 2023 as we were reorganizing our go-to-market structure. And so Greg George joined the company. ***We brought in a new sales leadership team and our sales coverage is very different today.***
>
> But there's some transition time of bringing new leaders in, building pipeline across the area in the space. And so ultimately, we did have fewer bookings in 2023, which led to less new wins going live in 2024. And when they did, they were later in this year. So you had this ramp seasonally, right, starting with really all your losses start to impact in the first quarter and then your new wins begin to go live as you go throughout the year. And so that was a dynamic of the bookings level in 2023.
>
> Importantly, we are expecting and still today double-digit ARR bookings growth in the second half of this year. ***And so that starts to build a different level of growth as we see new wins as we think about 2025 and 2026.*** But -- so that's one dynamic.
>
> . . .
>
> And so the focus there has been also on recurring revenue. And we talked about -- we covered it earlier, 92% of our business is recurring revenue. ***That is where our commercial teams are focused.*** $1 of ARR is worth so much more than $1 of nonrecurring. ***And so our teams are highly focused. We've changed the compensation structures to drive that behavior in our sales team in the deals that we see in the market today.***
>
> . . .
>
> ***So we can meet our growth objectives really just selling our own products that we have today into existing clients that we've got. So that's really the differentiator for us in terms of the market and really what's driving the growth in pipeline and bookings.***

113. The statements referenced in boldface in ¶112 were materially false and misleading when made because Defendants failed to disclose and/or misrepresented that the Company's sales team suffered from significant execution, operational, and organization-related issues, skyrocketing its compensation expenses, and inhibiting its growth, as follows:

(a) the Company was facing significant material undisclosed internal execution deficiencies following its Cloud Migration and Divestiture, including delays in closing deals for new and existing business, which delayed project start dates and deferred revenue recognition, as well as difficulties developing and innovating its AI-enabled technology, products, and services, both of which created a significant risk that the Company's overall bookings and renewals would face substantial declines; and

(b) the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel.

114. When asked about capital allocation, Heaton reminded investors about the Company's dividend initiative and commitment to consistent capital returns, stating, in pertinent part:

> So the first dividend will be here in the fourth quarter, $0.04 per share per quarter. ***And again, I wanted to make a very strong statement of we're very pleased with the strength of the balance sheet right now. The cash flow generation, we've got a lot of confidence around and wanted to make a stronger statement around returning capital in a consistent way and with our investors. And so those are really the top priorities from a capital allocation standpoint.***

115. The statements referenced in boldface in ¶114 were materially false and misleading when made because Defendants failed to disclose and/or misrepresented that:

(a) the Company was facing material significant undisclosed internal execution deficiencies following its Cloud Migration and Divestiture, including delays in closing deals for new and existing business, which delayed project start dates and

deferred revenue recognition, as well as difficulties developing its AI-enabled technology, products, and services, both of which created a significant risk that the Company's overall bookings and renewals would face substantial declines;

(b) the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel; and

(c) as a result of the foregoing, the Company would need to prioritize reinvesting its diminished capital to address its operational and execution-based issues and would therefore be unable to maintain its return of capital to shareholders through Alight's announced quarterly dividend program.

### C. February 20, 2025 Statements

116. On February 20, 2025, the Company issued a press release, presenting its fourth quarter and full year fiscal 2024 results. In the release, Defendants also provided investors with guidance for fiscal 2025 for specific financial metrics, the first full year under Guilmette's leadership after the Migration, as follows:

> The Company's 2025 outlook includes**:**
> - ***Revenue of $2,318 million to $2,388 million.***
> - ***Adjusted EBITDA of $620 million to $645 million.***
> - ***Adjusted diluted EPS of $0.58 to $0.64.***
> - Free cash flow of $250 million to $285 million.

117. The projections provided above in boldface in ¶116 were materially false and misleading when made because they were unrealistic in view of the numerous deficiencies after the Migration with the cloud-based system that relied on AI with which customers were not

satisfied and refusing to sign contracts. Defendants failed to disclose and/or misrepresented that the Company's 2025 outlook was unachievable or made without reasonable basis, because:

(a) the Company was facing material significant undisclosed internal execution deficiencies following its Cloud Migration and Divestiture, including delays in closing deals for new and existing business, which delayed project start dates and deferred revenue recognition, as well as difficulties developing its AI-enabled technology, products, and services, both of which negatively impacted the Company's overall bookings and renewals or at least created a significant risk that they would decline; and

(b) the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel.

118. Guilmette was quoted in the release, discussing Alight's fiscal 2024 results, and the Company's position entering fiscal 2025, in pertinent part, as follows:

> Alight concluded a transformative year on a strong note, with fourth quarter results that met expectations and included recurring revenue expansion and strong cash flow . . . We enter 2025 as a market-leading, technology-enabled services provider with a simplified foundation and an enviable client roster. ***With our multi-year technology modernization now complete and a strong leadership team in place***, ***we expect 2025 will be a transitional year focused on execution and steady progress across the key financial measures that drive profitable growth and attractive cash flow.***
>
> . . .
>
> 2025 revenue is impacted by the lagging effect of contract losses from 2023 and early 2024 . . . Absent these historical losses, our revenue growth rate would be over two points higher in 2025. ***Our operating trends today are vastly improved with full-year 2024 retention rates up 8 points compared to the prior year and***

> ***that will play through favorably for revenue later this year and into next year. Coupled with strong bookings growth and visibility into contracted go-lives, we expect to see revenue growth in the second half and moving forward***. We plan to share more detail of our long-range plan during our investor day, scheduled for March 20th, 2025.

119. The statements referenced in boldface in ¶118 were materially false and misleading when made because the Company's "multi-year technology modernization" and purported "strong leadership" would not drive "profitable growth," and its "operating trends" and "bookings" had not "vastly improved" or grown, respectively, so as to lead to revenue growth, as represented, because:

(a) the Company was facing significant material undisclosed internal execution deficiencies following its Cloud Migration and Divestiture, including delays in closing deals for new and existing business, which delayed project start dates and deferred revenue recognition, as well as difficulties developing its AI-enabled technology, products, and services, both of which negatively impacted the Company's overall bookings and renewals or at least created a significant risk that they would decline; and

(b) the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel.

120. In the accompanying earnings presentation, Defendants discussed the Company's sales momentum and the initiation of a $0.04-per-share quarterly dividend, stating, in pertinent part:

***Commercial momentum sustained with strong revenue under contract to start 2025.***

- New wins or expanded relationships with companies including Fortune Brands Innovations and Agilis Partners.
- Executed on double-digit ARR bookings for 2H24 with full-year ARR bookings of $114 million, representing growth of 18%.

***Balancing capital return while strengthening balance sheet.***

- Initiated quarterly dividend of $0.04 per share.

(footnotes omitted).

121. The statements referenced in boldface in ¶120 were materially false and misleading when made because the Company was not experiencing the "[c]ommercial momentum" with respect to its contracted revenue at the start of 2025 that Defendants represented, because:

(a) the Company was facing significant material undisclosed internal execution deficiencies following its Cloud Migration and Divestiture, including delays in closing deals for new and existing business, which delayed project start dates and deferred revenue recognition, as well as difficulties developing its AI-enabled technology, products, and services, both of which negatively impacted the Company's overall bookings and renewals or at least created a significant risk that they would decline; and

(b) the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel.

122. The Company also held an earnings call later that same morning (the "Q4 2024 Earnings Call"), during which Guilmette touted the Company's strong expectations for 2025 and attributed them to the "progress in execution" the Company made with its recent Cloud Migration and Divestiture initiatives, stating, in relevant part, as follows:

> Together, these milestones have collectively reset Alight's foundation, and we entered the new year with momentum as a tech-enabled employee benefit services company. ***With a significant transformation of 2024 behind us, 2025 will be a transitional year, marked by steady progress in execution as we continue to position Alight for profitable, market-leading and sustainable growth***.
>
> . . .
>
> ***The health of our business and cash flow profile enabled us to initiate a dividend*** and today, we announced a $200 million increase to our share repurchase authorization.
>
> Turning to our expectations for 2025: first, we are committed to both simplifying the business and providing more transparency into the key metrics we measure ourselves against. ***You will hear us focus on recurring revenue and the growth levers, including ARR bookings, and our retention of existing clients; adjusted EBITDA margin***, ***including positive impacts from the cloud migration and productivity initiatives; and now free cash flow, which covers all aspects of our improving cost and investment profile***. Moving forward, BPaaS will not be one of those key metrics.
>
> ***Our 2025 outlook reflects an important step in the right direction with year-over-year improvement across key financial metrics***. ***We expect recurring revenue to be on stronger footing, profit margin to expand independent of top line performance, and free cash flow to accelerate***. This is a long-cycle business, and our outlook also includes a lag effect on revenue from historical losses in 2023.
>
> . . .
>
> ***What gives me the most confidence in our long-term outlook is our current execution with ARR bookings growth and higher retention***, ***which are both grounded in delivering service excellence and competitive solutions.*** While Jeremy will cover the financials in more detail, I will focus today on what we need to do in 2025 to sustain momentum and enhance our value proposition.
>
> Starting with the go-to-market strategy. I am pleased to report the team delivered double-digit ARR bookings growth in the second half and ended 2024, up 18%. This is an important step toward delivering sustainable recurring revenue and we

> see strong demand for our mission-critical solutions with the sales pipeline up 54% from the prior year. We expect continued growth in ARR bookings at double-digit levels again in 2025.
>
> In our existing client base, we have significant white space to drive share of wallet and many of the wins this quarter are of the land-and-expand nature. ***We have a winning formula with a unified team of enterprise sellers and deep domain experts*** in delivering client management, supported by competitive solutions across the spectrum of employee benefits.

123. The statements referenced in boldface in ¶122 were materially false and misleading when made because Defendants failed to disclose and/or misrepresented that issues with the Company's execution would slow the growth of its ARR bookings, negatively impact the retention of existing clients, and prevent the Company from achieving the "profitable, market-leading, and sustainable growth" they touted, because:

(a) the Company was facing significant material undisclosed internal execution deficiencies following its Cloud Migration and Divestiture, including delays in closing deals for new and existing business, which delayed project start dates and deferred revenue recognition, as well as difficulties developing its AI-enabled technology, products, and services, both of which negatively impacted the Company's overall bookings and renewals or at least created a significant risk that they would decline; and

(b) the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel.

124. At the same earnings call, Heaton detailed the Company's financial targets and 2025 outlook, attributing the majority of it to the Company's "strong pipeline," "cloud migration," and "productivity efforts," stating, in pertinent part:

> Turning to our go-to-market momentum. We executed on our double-digit bookings growth in the second half of 2024 and for the year, achieved $114 million of total ARR bookings, an 18% improvement over 2023. Demand remains strong for both individual solutions and for our integrated offering. ***As a result, we expect to sustain double-digit ARR bookings growth in 2025***.
>
> . . .
>
> Turning to the outlook. ***We expect improvement across key financial metrics in 2025, which includes an improving growth rate, stronger profitability and increasing cash flow***. While our revenue growth is bounded in the short term with loss impacts from 2023 and nonrecurring project work, ***we are projecting over 150 basis points of adjusted EBITDA margin expansion and double-digit free cash flow growth as a result of the cloud migration and productivity efforts***. We expect full year revenue of approximately $2.32 billion to $2.39 billion, or negative 1.5% to positive 1.5% growth with revenue growth rates ramping through the year. ***At the midpoint, this includes recurring revenue up approximately 1% and project revenue down 6%. We expect higher recurring revenue growth rates in every quarter of 2025 compared to the prior year***.
>
> Given the first half dynamics of this year driven by historical losses and a cautious view on projects, I will be more specific on our seasonality and the ramp through 2025. For the first quarter, we expect total revenue to be down 3% to 4%, with recurring revenue down 1.5% to 2.5%. For the second quarter, we expect total revenue to be down 1.5% to 3%, including recurring revenue of negative 1% to positive 0.5%. ***For the second half, we expect a return to low single-digit to mid-single-digit growth, driven by new ARR deal go-lives and the early benefits of a stronger 2024 renewal cycle***.
>
> As Dave mentioned earlier, we have not seen an improvement in client demand for nonrecurring projects. ***Our outlook for the year is based on the specific pipeline we see today with these clients*** and expect first half revenue to decline roughly 25% in each quarter with mid-single-digit growth in the second half off of last year's lows.
>
> ***For the year, our revenue growth rate contemplates 5% to 7% of incremental revenue from new wins with current clients and new logos, 0 to 1% from participant volumes, and losses of over 6%***. Without the historical loss impact, our growth would be more than 2 points higher this year. We share a modest view on participant counts and do not expect a material uplift this year. While we continue to monitor policy changes, the business impact related to tariffs and the

> Department of Government Efficiency are expected to be immaterial based on the nature of our public sector work.
>
> ***We expect full year adjusted EBITDA of $620 million to $645 million with margin expansion between 150 and 180 basis points*. *We are confident in the margin expansion independent of the top line given the operational improvements we've made*.** We will benefit from $55 million of cloud migration savings, the elimination of transaction dis-synergies, and from productivity initiatives underway on the path toward 28% plus adjusted EBITDA margins. ***We expect full year adjusted EPS of $0.58 to $0.64, which does not include any impact from potential share buybacks***.
>
> We are introducing our free cash flow outlook of $250 million to $285 million or growth of 13% to 29%. Free cash flow will benefit from stronger profitability as well as reduced capital expenditures. ***Finally, we expect annual ARR bookings of $130 million to $145 million, continuing a growth trajectory as we benefit from a strong pipeline and the ARR focus on employee benefits***.
>
> ***Overall, our fourth quarter results were a positive step forward, and we believe that 2025 will be another step forward that positions us to achieve our longer-term goals.***

125. The statements referenced in boldface in ¶124 were materially false and misleading when made because Alight was not in a position to achieve the "ARR bookings," adjusted EPS, adjusted EBITDA, and growth outlook for 2025 Defendants touted because, Defendants failed to disclose and/or misrepresented that:

(a) the Company was facing significant material undisclosed internal execution deficiencies following its Cloud Migration and Divestiture, including delays in closing deals for new and existing business, which delayed project start dates and deferred revenue recognition, as well as difficulties developing its AI-enabled technology, products, and services, both of which negatively impacted the Company's overall bookings and renewals or at least created a significant risk that they would decline; and

(b) the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced

workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel.

126. During the same February 20, 2025 earnings call, Heaton also commented on the Company's go-to-market execution and growth strategy, which included touting Alight's apparent dedicated teams focused on new customer acquisition and on expanding existing client relationships:

> And maybe what I'd add on that one, Pete, is, as we've said before***, we have dedicated teams that are out hunting new logos, and we have dedicated teams that are working with our existing client base on expansions, right, and similar to what Dave talked about within the leaves opportunity. We can meet our target growth objectives within this business really only from the white space in our existing client base***.

127. The statements referenced in boldface in ¶126 were materially false and misleading when made because Defendants failed to disclose and/or misrepresented that:

(a) the Company was facing significant material undisclosed internal execution deficiencies following its Cloud Migration and Divestiture, including delays in closing deals for new and existing business, which delayed project start dates and deferred revenue recognition, as well as difficulties developing its AI-enabled technology, products, and services, both of which negatively impacted the Company's overall bookings and renewals or at least created a significant risk that they would decline; and

(b) the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among

experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel.

**D. February 27, 2025 Statements**

128. On February 27, 2025, Alight filed its Annual Report on Form 10-K with the SEC for the year ended December 31, 2024 (the "2024 Form 10-K"). The 2024 Form 10-K included Sarbanes-Oxley certifications signed by, among others, Defendants Guilmette and Heaton. Exs. 32.1, 32.2. The 2024 Form 10-K described the Company's quarterly dividend program, stating that Alight intended to continue paying regular quarterly cash dividends, which depend on the Company's operating performance:

> ***In 2024, our Board of Directors approved a new quarterly dividend program. The Company intends to continue paying regular cash dividends on a quarterly basis. Any decision to declare and pay dividends in the future will be made at the sole discretion of our Board of Directors, whose decision will depend on, among other things, our results of operations, cash requirements, financial condition, contractual restrictions and other factors that our Board of Directors may deem relevant.*** On November 12, 2024, our Board of Directors declared a regular cash dividend of $0.04 per share of Class A Common Stock, payable on December 16, 2024 to shareholders of record at the close of business on December 2, 2024.
>
> The dividend resulted in aggregate payments of approximately $21 million during the year ended December 31, 2024. On February 13, 2025, the Company announced that its Board of Directors approved the payment of a quarterly dividend in the amount of $0.04 per share of Class A Common Stock on March 17, 2025, to shareholders of record as of the close of business on March 3, 2025.

129. The statements referenced in boldface in ¶128 were materially false and misleading when made because Defendants failed to disclose and/or misrepresented that:

(a) the Company was facing significant material undisclosed internal execution deficiencies following its Cloud Migration and Divestiture, including delays in closing deals for new and existing business, which delayed project start dates and deferred revenue recognition, as well as difficulties developing its AI-enabled

technology, products, and services, both of which negatively impacted the Company's overall bookings and renewals or at least created a significant risk that they would decline;

(b) the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel; and

(c) as a result of the foregoing, the Company would need to reinvest its diminished capital to address its operational and execution-based issues and would therefore be unable to maintain its return of capital to shareholders through Alight's quarterly dividend program.

**E. March 20, 2025 Statements**

130. During the Analyst/Investor Day presentation, Guilmette outlined his confidence in Alight's current position and its capability to capitalize on future prospects, in pertinent part, as follows:

> ***Our current assets and our current capabilities position us for commercial success***. One of the first things I did when I came on as CEO was take a hard look at what do our solutions look like, what do we have, how are we going to market. ***We don't really need anything more than what we have***. Yes, we'll fine-tune and maybe some opportunities to maybe tuck some things in here or there. But ***the core aspects of what we have in Alight today as a services company, delivering employee benefits is best in class, and it's an opportunity for us to grow and have real commercial success.***
>
> And finally, ***we have a very compelling view and line of sight to creating significant shareholder value***. And you'll see Jeremy walk you through the details around what those financials look like. But suffice to say, ***we're in a great position as we take this business forward to create great shareholder value.***
>
> . . .

> ***Our growth strategy and execution will deliver high-quality revenue growth, margin expansion and free cash flow. We have a clear line of sight to mid-single-digit revenue growth. We have a defined path to 28% margin in 2026 and even more in 2027.*** We have double-digit free cash flow growth. We have a cumulative free cash flow number of $1 billion over 2025 through 2027. ***Think about that, $1 billion of free cash flow accumulation from a company that today is currently valued at $3 billion. We are poised to deliver significant shareholder value***.

131. The statements referenced in boldface in ¶130 were materially false and misleading when made because Defendants failed to disclose and/or misrepresented that neither its "current capabilities" nor its "growth strategy" or "execution" would deliver the financial results Defendants touted because:

(a) the Company was facing significant material undisclosed internal execution deficiencies following its Cloud Migration and Divestiture, including delays in closing deals for new and existing business, which delayed project start dates and deferred revenue recognition, as well as difficulties developing its AI-enabled technology, products, and services, both of which negatively impacted the Company's overall bookings and renewals or at least created a significant risk that they would decline; and

(b) the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel.

132. Later during the conference, Heaton took over to discuss, in further detail, the Company's current position and resiliency in overcoming the initial hurdles it faced in

transforming its business through the Cloud Migration and Divestiture, by stating, in pertinent part:

> ***I also want to cover the resiliency within this business. It's in the current macro dynamics, it's important to understand we have a predictable growing recurring revenue base. It's tied to long-term contracts, call it, 3 to 5 years in nature***, and we're delivering mission-critical work on behalf of the largest, most complex companies throughout the world. And we've got a healthy balance sheet. We delevered [sic] last year to below 3x, and we have an improving cash flow profile, which I'll walk you through here today.

133. The statements referenced in boldface in ¶132 were materially false and misleading when made because Defendants failed to disclose and/or misrepresented that the touted "predictable growing recurring revenue base" "tied to long term contracts" was neither predictable nor growing as represented because:

(a) the Company was facing significant material undisclosed internal execution deficiencies following its Cloud Migration and Divestiture, including delays in closing deals for new and existing business, which delayed project start dates and deferred revenue recognition, as well as difficulties developing its AI-enabled technology, products, and services, both of which negatively impacted the Company's overall bookings and renewals or at least created a significant risk that they would decline; and

(b) the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel.

134. Heaton also provided details regarding the Company's fiscal 2025 guidance presented during its Q4 2024 Earnings Call and outlined projections for fiscal years 2026 and 2027, stating, in relevant part:

> Moving to the outlook for 2025. This is what we laid out last month at earnings. What you should know here is 2025 is a transition year. What you've heard about today is 2023 wasn't perfect. And so we've got a lag effect of some of the items that happened 1.5 years ago, and there's still a lag effect as it comes through into 2025. But we're operating the business very differently today, and we like the trends that we're seeing.
>
> ***Revenue this year will be flat at the midpoint with recurring revenue up 1%***. Within the revenue line, there's a difference as it ramps throughout this year. So the losses that we're seeing this year coming through really starts on January 1, while the new deals that we booked last year, that Greg walked through, begin to go live as we go throughout this year. And so ***there's going to be an inflection point in our growth into the second half with low to mid-single-digit growth in the second half with continued execution and the momentum that we're seeing today***. From a margin perspective, we've done a lot of work already here, and ***we expect 150 to 180 points of margin expansion and brings us really to about 27% EBITDA margin within this business this year.***
>
> The last area I'll cover is free cash flow, and I'll spend more time on this as we go through the deck today. But at the midpoint, 20% growth in free cash flow. We're driving more efficiencies and uses of our cash, and we've simplified our business model. So here are the midterm targets that Dave laid out for you earlier today. ***Organic revenue growth back to mid-single digits based on continued ARR bookings growth, an improving retention profile and a real opportunity now with our platform and distribution to drive greater partnerships and revenue growth***.
>
> As I said, ***back 27% EBITDA margins this year, on the path to 30% EBITDA margins, much of which is the work has been done***, and I'll walk you through the bridge to get to 30%. And then finally, $1 billion, cumulative cash flow over the next 3 years, again, more efficiencies, and I'll walk you through areas like working capital, capital expenditures, some of the areas that are really going to drive free cash flow for this business, $1 billion.
>
> . . .
>
> I'll talk about project revenue a little bit more, but we've assumed participant counts about 1% within the outlook, and ***we've assumed project revenue to be flat from what is really a low point that we see this year in 2025. So here's what it looks like just on the bridge. We're at the minus 1.5% to positive 1.5%, so flat today***. What you'll see this is also time scaled. ***You'll see, first, the impacts of the***

***retention coming back to us. And so the improvement there, you start to see first***.

Next, you'll see the continued momentum of what bookings and volumes provide. And then I would say you could expect the partners to be on the outside of that from a timing perspective. And I won't need to do the math for this group. You've probably already done it. If you look at the top end of each of these ranges, you can see growth that is outsized of the model. We do expect that there's always going to be mix. The environment can change. There's always going to be a change in timing between the types of deals that we're doing and what we see between wins and losses. But that's really how we think about the growth model for this business.

I did want to capture here for everybody on project revenue. ***So again, flat is our view in terms of the outlook. You can see really the last 5 years, including this year's outlook in project revenue.*** This is important work that our teams are doing every day with our clients. ***We hit a peak of $219 million in 2023***. It's always been roughly a little bit less than 10% of the revenues in this business. Off of that peak last year in 2024, ***project revenue was down 10%, and we're calling it to be down about another 6% at the midpoint this year***. So call it, $185 million. ***We have not seen a pickup in demand. And so we do want to be cautious in terms of the view in terms of the outlook. But history tells us this work comes back***.

. . .

***We also have great visibility over the long term in our business***. You can see here, we've grown our recurring revenue base by $400 million since 2021. You can see the growth rate on recurring. ***Just given our focus on the ARR bookings, our recurring revenue base has outgrown the total revenue for the company***. Since last year, we've also updated our disclosures, so we report revenue under contract now going out 3 years. So a couple of things I'd point out here. ***First, in 2026, we already have greater than 2/3 of our revenue under contract. And if you look out to the $1.2 billion in 2027, that longer-term view is up 6% today versus where that same longer-term view was last year based on the momentum that we're seeing in the operations of the company***.

. . .

So let me give you the bridge for EBITDA. So starting where we finished last year at 25% EBITDA margins***. The first bucket here is what we've already guided to for the year. So the cloud transformation benefits, the dyssynergies being eliminated, offset with the normalized inflation that we typically get every year is our '25 outlook that brings us to about 27%.***

. . .

And finally, on capital return, ***we initiated the quarterly dividend in the fourth quarter of last year. And we've got share buyback authorization of $281 million, which we will be opportunistic on for sure. And so the way to think about it is free cash flow post our TRA is largely going to go towards capital return to our investors***.

So let me close where Dave started. ***Hopefully, you've gathered today the level of focus and execution that's underway by this team. We're leveraging our market leadership position to drive better outcomes for clients and grow those relationships along with new clients leveraging our platform and our capabilities. And by doing that, our growth inflects and we'll create more shareholder value through an earnings and free cash flow profile that grows in excess of the top line.***

135. In the presentation accompanying Alight's Analyst/Investor Day conference, Defendants outlined the Company's "clear path" to shareholder value, touting its projected "double-digit ARR bookings growth" resulting from "improved retention" and "new wins," stating, in pertinent part:

***We have a clear path to creating shareholder value through margin expansion and robust free cash flow.*** The integration of Client Management with Delivery is reinvigorating our already strong retention approach. ***Projected double-digit ARR bookings growth in 2025. Stronger win rates and larger deal sizes***. ***Financially positioned to and intensely focused on driving long-term shareholder value. Commercial momentum and client-centric focus support our growth model. Disciplined capital allocation approach. Highly resilient business model.*** Healthy balance sheet. ***Incremental ARR from new wins & improved retention supports 2nd half ramp.*** New wins +6-8% annually. ***Long-term recurring revenue foundation is stronger. Capital allocation philosophy supported by healthy balance sheet to drive shareholder value. Initiated quarterly dividend in 2024.***

136. The statements referenced in boldface in ¶¶134-35 were materially false and misleading when made because Defendants failed to disclose and/or misrepresented that the Company had not "improved [ARR] retention," could not reasonably expect "double-digit ARR bookings growth in 2025," did not have "stronger win rates" that could "support[] [a] 2nd half ramp," and did not have a "[l]ong-term recurring revenue foundation [that was] stronger," because:

(a) the Company was facing significant material undisclosed internal execution deficiencies following its Cloud Migration and Divestiture, including delays in closing deals for new and existing business, which delayed project start dates and deferred revenue recognition, as well as difficulties developing its AI-enabled technology, products, and services, both of which negatively impacted the Company's overall bookings and renewals or at least created a significant risk that they would decline; and

(b) the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel.

**F. May 8, 2025 Statements**

137. On May 8, 2025, Alight issued its press release reporting first quarter results and "reaffirmed" its previous fiscal 2025 outlook. Guilmette spoke to their decision to uphold guidance, stating, in relevant part:

> We continue to benefit from a long-cycle recurring business model that has insulated us from short-term market swings as ***we already have 92% of projected 2025 revenue under contract. While we are not immune to the market impacts, we feel good about the operational levers within our control and have reaffirmed our outlook based on the resilience of our model and visibility today.***

138. On the same day, Alight held its Q1 2025 Earnings Call to discuss that quarter's financial results. During the call, Guilmette reaffirmed the Company's previous outlook, attributing it to Alight's execution of its Cloud Migration strategy, in relevant part, as follows:

> While we continue to watch the economy with a cautious view, ***we feel good about our revenue under contract, the momentum from our renewals and the***

> ***operational initiatives underway that will continue to drive margin expansion*** and more free cash flow. ***As a result, we are reaffirming our financial outlook for the year***. We talked at length about the importance of retention. ***And to start the year, our renewal trends remain on track with execution of our renew everyday program***. We have already renewed several top clients this year, including Starbucks, Baxter, US Foods and Otis Elevator Company, who have been important clients, and we look forward to continuing to partner and innovate with them.
>
> ***These are examples of the confidence our clients have in our vision and the value we deliver, retaining and then expanding upon those relationships is a critical element that powers the flywheel to accelerating financial performance and delivering long-term shareholder value. Two key components of this are leveraging our technology transformation and delivering service excellence***.
>
> ***Within technology, our team has been laser-focused on delivering value for our clients and participants through accelerating innovation and AI enablement***

139. The statements referenced in boldface in ¶¶137-38 were materially false and misleading when made because while describing the Company's "renewal trends" favorably and reaffirming Alight's financial outlook for the year based on its "revenue under contract" and "the momentum from [its] renewals and the operational initiatives underway that will continue to drive margin expansion," Defendants failed to disclose and/or misrepresented that:

(a) the Company was facing significant material undisclosed internal execution deficiencies following its Cloud Migration and Divestiture, including delays in closing deals for new and existing business, which delayed project start dates and deferred revenue recognition, as well as difficulties developing AI-enabled technology, products, and services, both of which negatively impacted the Company's overall bookings and renewals or at least created a significant risk that they would decline; and

(b) the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced

workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel.

140. At the same earnings call, Heaton also provided an update on the Company's quarterly results and reaffirmed the Company's previous outlook, in pertinent part, as follows:

> Revenue was $548 million and at the midpoint of our guidance range. Recurring revenue comprised nearly 95% of total revenue in the quarter and performed as expected. Nonrecurring project revenues were down $10 million or 26%, in line with our expectations as well. We entered the year fairly cautious on project revenue, and this continues to remain the case in the current market**.** With our progress in the first quarter, we now have 92% or $2.2 billion of projected 2025 revenue under contract.
>
> ***Our team is intensely focused on securing the remaining renewals in this cycle and commercial execution across both recurring and project revenue***. Adjusted gross profit was $200 million for the quarter. Similar to prior quarters, this is impacted by cost to support the divested business, which are reimbursed for the TSA and other income. This amounted to $10 million in the quarter.
>
> Adjusted EBITDA was $118 million for the quarter at the high end of our guidance range. Free cash flow was $44 million for the quarter, in line with our expectations with timing impacts of tax payments and divestiture-related items. We remain on track towards our annual target of $250 million to $285 million of free cash flow. Finally, we returned $41 million to shareholders this quarter via share buybacks and our quarterly dividend**.**
>
> . . .
>
> Now let me turn to our outlook. ***We are seeing continued momentum during this renewal cycle. And in addition, while we navigate the current environment, we continue to execute on the day-to-day operations and value-creating initiatives we kicked off last year.*** As Dave mentioned, while we benefit from a more stable business model, we are watching a few key areas closely given the market dynamics, mostly around the demand environment and any longer-term impacts to client participant accounts.
>
> ***We are reaffirming our outlook for 2025, and this reflects our revenue under contract and operational levers driving enhanced productivity***. ***Our transformation initiatives are on track to deliver a better client experience, streamline processes and drive margin expansion***. Today, we disclosed a 15-month restructuring program that supports these activities. Importantly, with all

cash investment and benefits already included in our 2025 guide and midterm financial framework from Investor Day.

141. The statements referenced in boldface in ¶140 were materially false and misleading when made because while discussing Alight's reaffirming Alight's financial outlook for the year based on its "revenue under contract" and "operational levers driving enhanced productivity" and Defendants failed to disclose and/or misrepresented that:

(a) the Company was facing significant material internal execution deficiencies following its Cloud Migration and Divestiture, including delays in closing deals for new and existing business, which delayed project start dates and deferred revenue recognition, as well as difficulties developing and innovating its AI-enabled technology, products, and services, both of which negatively impacted the Company's overall bookings and renewals;

(b) the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel.

142. Guilmette also made clear during the May 8, 2025 earnings call that the Company could withstand the ongoing macroeconomic noise in the Spring of 2025, rejecting the notion that it would negatively impact Alight's business:

<Q: Kyle David Peterson – Needham & Company, LLC – Research Division> Great. Nice results. But I just wanted to sort of touch a little bit on the guide and kind of what you guys are seeing in the sales cycle. It sounds like you guys are -- might think that the deal cycles could get extended a bit given the macro. I guess, is that -- is some of that commentary there just being cautious? Or has there been any change in client behavior and decision-making like in the last like month or so, given all the like trade war and uncertainty?

> <A: David D. Guilmette> Yes. Kyle, it's Dave. Thanks for your question. ***We've not really seen any material shift in the buying patterns to date***. It's much more about just the overall environment that we're all dealing with. The degree to which there are changes that are happening coming from policy positions with the administration, it just makes our clients stop and think a little bit more about the types of projects that they may undertake or things that might be discretionary. But ***we've not seen anything that would be taken off the table at this point***. And the way that would typically play out is how we put it into 2 categories.
>
> You've got ***-- the bigger kinds of moves that clients would make introducing on new programs such as the navigation solution, making a change relative to leaves administration or the core benefit administration offerings that we have***. Those tend to follow typical cycles when contracts renew, et cetera. And ***I would say those are all very much underway.***
>
> It would be ***more related to things that might be a little bit more short term***, so expansions perhaps where there might be another layer of decision-making or a little bit more caution, and ***that might push a contract being executed out by a couple of weeks, that sort of thing. But we've really not seen anything protracted or anything that would give us a serious concern at this point relative to buying patterns.***

143. The statements referenced in boldface in ¶142 were materially false and misleading when made because Defendants' represented that there was no "serious concern" about client "buying patterns" while failing to disclose and/or misrepresenting that the Company was facing significant undisclosed internal execution issues following its Cloud Migration and Divestiture, including delays in closing deals for new and existing business, which delayed project start dates and deferred revenue recognition, as well as difficulties developing its AI-enabled technology, products, and services, both of which negatively impacted the Company's overall bookings and renewals or at least created a significant risk that they would decline.

### G. May 14, 2025 Statements

144. On May 14, 2025, Guilmette and Heaton participated in the J.P. Morgan Global Technology, Media and Communications Conference. During his prepared remarks to investors, Guilmette discussed how the Company was successfully executing its transformed business by,

*inter alia*, focusing on sales execution and reshaping its executive leadership to add domain expertise:

> ***And so getting back to our roots means focusing on those fundamentals and executing well every day. And I've made changes to our executive leadership team to bring more of that domain expertise to the helm.*** We've repositioned how we support our largest client relationships, the top couple of hundred of those by bringing a number of key strategic account executives who have that ***domain expertise to the table to help support those relationships and help solve our client problems.*** And the way we get an opportunity to add more solutions and to grow those relationships is to be very attuned to what they deal with every day. And you have to be attuned to that with that level of expertise. . . . ***So we have great experts who came to us over the last few years who are really good enterprise salespeople, and we're marrying them up with the domain experts*** who know how to listen for the problems and the challenges that our clients have when we can bring solutions to them. . . . I'd love to say we win them all and we retain them all.

145. The statements referenced in boldface in ¶144 were materially false and misleading when made because Defendants failed to disclose and/or misrepresented that:

(a) the Company was facing significant material undisclosed internal execution deficiencies following its Cloud Migration and Divestiture, including delays in closing deals for new and existing business, which delayed project start dates and deferred revenue recognition, as well as difficulties developing its AI-enabled technology, products, and services, both of which negatively impacted the Company's overall bookings and renewals; and

(b) the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel.

146. During the question-and-answer segment of the conference, Guilmette was asked about revenue retention and the factors enabling the Company to maintain its strong retention levels:

> <Q: Tien-Tsin Huang– JPMorgan Chase & Co, Research Divisiont> Okay. So just to bring it to a high level then, if you don't mind, just thinking about this refocus that you just went through, what is making that [revenue retention] possible? Is it the underlying technology is in a place that allows you to do that? Is it the changes you've made from an organizational standpoint and the people that are coming in that are more focused? Just tell us about what makes this execution possible.
>
> <A: David D. Guilmette> ***So the answer is yes to both of those***, and it really kind of predates me at the start. So when we divested of the payroll professional services business, it allowed us to focus back on our core and our roots, which is employee benefit services delivery fundamentally. ***And then you align the teams around what those priorities are, and we've done that***. I have through a refresh of our executive leadership team and bringing on folks like David Essary and others who are really instrumental in ***helping us to be able to execute on that strategy***. ***And then the movement in the cloud migration that occurred and was completed last year was a massive step in that direction.***
>
> Not for the faint of heart, as you know, ***a very significant investment, but that allowed us to be able to retire our data centers and have the -- really all the advantages of being on the cloud***. One example of that is just system stability, which led to probably the cleanest annual enrollment we've experienced in our history. We saw a 12-point increase in NPS score related to annual enrollment. And that's massive. And the system was operational, I think, all about 1 minute or 1.5 minutes during that annual enrollment cycle, which really hadn't happened before. And all of that was enabled by that cloud migration.

147. The statements referenced in boldface in ¶146 were materially false and misleading when made because Defendants failed to disclose and/or misrepresented that the Company was facing significant undisclosed internal execution issues following its Cloud Migration and Divestiture, including delays in closing deals for new and existing business, which delayed project start dates and deferred revenue recognition, as well as difficulties developing its

AI-enabled technology, products, and services, both of which negatively impacted the Company's overall bookings and renewals.

## VI. A PARTIAL CORRECTIVE DISCLOSURE INCREMENTALLY REVEALED THE FRAUD WHILE DEFENDANTS CONTINUED TO MAKE FALSE AND MISLEADING STATEMENTS[12]

### A. August 5, 2025 Statements And Partial Disclosures

148. Investors first began to learn some of the truth about the problems with Alight on August 5, 2025, when the Company issued a press release, publishing their second quarter results. The results were as follows:

> **Second Quarter 2025 Highlights** (all comparisons are relative to second quarter 2024)
> - Revenue decreased 1.9% to $528 million.
> - Gross profit of $176 million and gross profit margin of 33.3%, compared to $167 million and 31.0%, respectively, and adjusted gross profit of $205 million and adjusted gross profit margin of 38.8%, compared to $196 million and 36.4%, respectively.
> - Net loss of $1,073 million compared to net loss of $4 million, primarily driven by the $983 million non-cash goodwill impairment charge related to our Health Solutions reporting unit.
> - Adjusted EBITDA improved to $127 million from $105 million
> - Diluted loss per share of $2.03 compared to diluted loss per share of $0.01, and adjusted diluted earnings per share of $0.10 compared to $0.05 per share.
> - New wins or expanded relationships with companies including Thermo Fisher Scientific, Highmark Health, Reinsurance Group of America, Incorporated (RGA) and Trinity Industries.
> - Repurchased $20 million of common stock under existing share repurchase program.
> - Declared and paid a $0.04 per share dividend

149. In the release, Guilmette explained that "deals [are] taking longer to close in the current environment, which is temporarily delaying planned growth." Accordingly, Alight

[12] In this section, only those statements bolded and italicized are alleged to be false and/or misleading.

reduced its revenue guidance from $2,318 million to $2,388 million to "[r]evenue of $2,282 million to $2,329 million."

150. Despite the negative news, Guilmette assured investors that Alight's "***underlying business operations continued to strengthen during the second quarter***[.]" Guilmette also emphasized that Alight's initiatives are "***driving continued strength in client retention***."

151. The statements referenced in boldface in ¶150 were materially false and misleading when made because Defendants failed to disclose and/or misrepresented that the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel and as a result, Alight's underlying business operations were not "continu[ing] to strengthen" or "driving continued strength in client retention."

152. That day, Alight also held an earnings call with analysts and investors (the "Q2 2025 Earnings Call"), during which Guilmette expanded on the Company's disappointing financial results while continuing to mislead the market regarding issues with the Company's ongoing workforce-related and ARR pipeline, stating, in pertinent part:

> Revenue for the quarter was $528 million and adjusted EBITDA was $127 million, representing an 80 basis point margin increase over the prior year. Free cash flow for the first half was up over 30%. And taken together, these results position us to deliver strong profitability and robust cash flow over the long term.
>
> New deals are taking longer to close through the first half. And in response, we are taking actions to improve our commercial execution. We have updated our revenue outlook for 2025 and reaffirm the rest of our guidance, which we'll discuss in more detail during today's call.
>
> . . .

> The pace of ARR bookings was not at the level we expected coming into the quarter for 2 primary reasons: First, client expansion opportunities are taking longer to close in the current environment; and second, our commercial execution to get deals across the line has not been sufficient. Overall, our solution competitiveness and positioning remained strong but the timing of deals impacts eventual start dates, and in this case, our expected second half 2025 revenue.
>
> To accelerate our commercial execution, we are building more domain expertise with specialty sales experience to balance with our enterprise sales team. We've recently made changes within our commercial organization and have a search underway for new Chief Commercial Officer. ***The success of the commercial team is a top priority of mine, and I'm pleased with the quality of talent who have expressed interest in Alight and the opportunity to advance our commercial capabilities.***
>
> ***Our ARR pipeline remained strong, particularly for deals in later stages.*** Opportunities where we are finalists are up 35% versus this time last year, which should increase our conversion rates in the second half sales cycle.
>
> For project revenue, we have not yet seen an uptick in our pipeline. Clients are still assessing their go-forward plan design strategies, while M&A and regulatory work remains at low levels.
>
> So given this backdrop, we are updating our expectations for second half revenue, which Jeremy will cover in more detail. ***As we doubled down on employee benefit services, we continue to build out a management team with internal and external talent who can extend our competitive advantages***.

153. The statements referenced in boldface in ¶152 were materially false and misleading when made because Defendants discussed the talent of Alight's "management team" while failing to disclose and/or misrepresented that the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel.

154. Heaton provided additional color on the Company's disappointing quarterly results and the justification for Alight's goodwill impairment charge, stating, in pertinent part, as follows:

> Revenue was $528 million, with recurring revenue comprising over 93% of total revenue in the quarter. . . .
>
> Nonrecurring project revenues were down $9 million or 20%. As a reminder, we entered the year cautious on project revenue, and this remains the case in the current environment.
>
> Adjusted gross profit was $205 million. Similar to prior quarters, this is impacted by cost to support the divested business, which are reimbursed through the TSA and other income. Normalized for this, adjusted gross profit would be $8 million higher.
>
> Adjusted EBITDA was $127 million for the quarter, and adjusted EBITDA margin expanded 80 basis points as our prior transformational initiatives are delivering favorable results as expected.
>
> Free cash flow for the first half was $102 million, up 31% from the prior year and on track towards our annual target of $250 million to $285 million. ***While we continue to have strong confidence in the prospects of our health solutions reporting unit, the current market valuation of Alight as compared to the value when going public, combined with the current macro and industry conditions, requires us to take a noncash goodwill impairment charge of $983 million***. This value is consistent with the long-term forecast as communicated at our 2025 Investor Day.
>
> Finally, we returned $42 million to shareholders this quarter via our quarterly dividend and through the repurchase of $20 million worth of shares. We ended June with $241 million remaining on our share buyback authorization.

155. The statements referenced in boldface in ¶154 were materially false and misleading when made because Defendants falsely attributed the $983 million noncash goodwill impairment charge in part to "the current market valuation of Alight as compared to the value when going public, combined with the current macro and industry conditions[.]" Attributing the goodwill impairment charge to "macro and industry conditions" was false and misleading. None of Alight's publicly traded competitors (ADP, Conduent, Voya, WTW, HealthEquity) took a goodwill impairment charge for that time period, much less an impairment charge related to macro or industry conditions, which one would expect them to do if "macro[economic] and industry conditions" were a cause. Thus, it was false and misleading to attribute the impairment

charge to those factors when in reality it was due to Alight-specific operational and execution problems. The reason for the goodwill impairment charge, which investors had a right to know about, was the following:

(a) the Company was facing significant material undisclosed internal execution deficiencies following its Cloud Migration and Divestiture, including difficulties developing its AI-enabled technology, products, and services, which negatively impacted the Company's overall bookings and renewals; and

(b) the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel.

156. Heaton also explained management's decision to reduce the Company's full year outlook for ARR and project revenue, but misleadingly reaffirmed its full year outlook for EBITDA, EPS, and free cash flow, which it attributed to the "initiatives" it had in place and its "operational levers":

> Now let me turn to our outlook. Dave mentioned a number of important clients who renewed long-term contracts with us, including expansions. The momentum during this renewal cycle remains strong. With what we see today, the 2025 renewal cycle is in line with our original guidance and we continue to expect an improved retention rate in 2026. There are, however, factors that have made us more cautious in the second half.
>
> Our initial ARR bookings guidance was for double-digit growth and today, we're expecting bookings that are closer to flat or slightly down year-over-year. This is not where we expected to be, and our in-year revenue resulting from first half bookings will be lower in the second half.
>
> Our pipeline remains strong, and we expect a higher conversion rate as we finish 2025 based on the number of late-stage deals in process as well as changes we have already made within the team.

> Moving to project revenue. June and July are typically when we see the project pipeline build and have more transparency into our enrollment work for the remainder of the year. At this point, we are not seeing the second half pipeline build to levels that would drive an inflection in project revenue.
>
> Clients continue to assess how to move forward with their people strategies as they navigate the current environment, while M&A and regulatory changes remain low. And so we expect third quarter project revenue in line with the second quarter rate, which was down 20%.
>
> Finally, we have not seen growth in participant counts and expect volumes to remain flat this year. We now expect total revenue to be lower by roughly $45 million at the midpoint.
>
> . . .
>
> As it relates to other key metrics, ***we are reaffirming the remainder of our 2025 outlook, which reflects the initiatives we have already completed and operational levers that are independent of top line growth.***
>
> . . .
>
> In closing, we are ***intensely focused on execution*** and improving our top line performance while continuing to drive greater margin expansion and cash flow.

157. The statements referenced in boldface in ¶156 were materially false and misleading when made because while reaffirming the remainder of Alight's 2025 outlook, Defendants failed to disclose and/or misrepresented that the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel, all of which negatively impacted the Company's ability to meet the projections it provided, or at least created a significant risk that the Company would not be able to meet them.

158. During the same August 5, 2024 earnings call, Defendants further fielded several inquiries regarding hiring practices in an effort to improve sales execution, affirming that such efforts were well underway:

> <Q: Scott Anthony Schoenhaus – KeyBanc Capital Markets Inc. – Research Division> . . . And then you mentioned sort of a change around the sales team, and you mentioned more domain expertise as a potential catalyst or a focus. Can you maybe talk about that? And what you saw with these in this current last 90 days that made you more focused on a commercial team with more domain expertise?
>
> <A: David D. Guilmette> Sure, Scott. Thank you for that question. I'm in the market a lot. I'm in front of our clients a lot. I'm in front of our PPEs a lot. There isn't a week that goes by that I'm not in the market. And in many cases, in these pursuits directly with the sales team, in my observation over the last 90 days or so is that some of these sales require real deep domain expertise to be able to bring to life our value proposition. ***Like these things, we're in every one of these deals, and that's the feedback that we get from our PPEs***. But if something doesn't come our way, oftentimes, it's on the margins, it's not like the core positioning of the sales pursuit of the execution. And that's where, in my opinion, ***we need real strong deep domain expertise. In particular, when you look at some of the specialty opportunities that we're talking about, navigation and leaves. Leaves is a complex space, and you need real expertise to be able to bring that to life.***
>
> So ***I like what we've done in terms of building out our capacity on the enterprise sales front. We've got plenty of capacity***, ***plenty of feet on the street,*** and we've got lots of good opportunities that are coming through the top of the pipeline, and we like our qualified pipeline. We've got to close more deals. And to close more deals, we need that subject matter expertise at the table.
>
> . . .
>
> <Q: Andrew David Polkowitz – JPMorgan Chase & Co – Research Division> I wanted to start by asking a follow-up on just a focus on the commercial organization. You mentioned that you have capacity. So given those comments, how should we think about sales force hiring plans and what's embedded in the outlook for the second half and into 2026?
>
> <A: David D. Guilmette> . . . ***I would characterize the hiring plans is looking for that specialty expertise. We've already brought on a number of individuals in the second quarter to help in that regard***. Navigation sales leadership, for example, beefing up what we're doing on the lease side, beefing up what we're doing in terms of how we tell our AI story. We've got a really impactful one that we're proud of. So we're making those changes as well by bringing in certain experts to really help bring that to life. ***So all of that, I think, has happened***

> ***already in addition to our looking to bring in a new Chief Commercial Officer***. We feel really good about the talent that has identified themselves to want to come here. So I'm confident we're going to have the right person, the right fit in short order. And I think we're going to be fine as we look at the second half of the year going into 2016 [sic.] from a sales execution capacity standpoint.

159. The statements referenced in boldface in ¶158 were materially false and misleading when made because Defendants discussed Alight's success in hiring for the sales team but failed to disclose and/or misrepresented that the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel.

160. Investors and analysts reacted immediately to Alight's revelation. The price of Alight's common stock declined dramatically from a closing market price of $5.13 per share on August 4, 2025. Alight's stock price fell to $4.19 per share on August 5, 2025, a decline of about 18.32% in the span of just a single day. Defendants, however, continued to conceal the full truth about the extent of the Company's significant material operational and internal execution deficiencies, how difficult those deficiencies would be to correct, and their impact on the Company's financial performance. As a result, the price of Alight common stock remained artificially inflated.

161. A number of well-known analysts who had been following Alight lowered their price targets in response to Alight's disclosures. For example, JP Morgan, while "withdraw[ing] [their] Dec 25 price target," highlighted management's admitted execution shortcomings: "FY25 revenue outlook was lowered by ~2% at the midpoint primarily driven by softer than expected contribution from bookings . . . with management attributing part of the underperformance to macro uncertainty . . . and part to internal execution that needs to improve." Breaking down the

quarterly shortfall, the analyst "commend[ed] management for taking ownership of the bookings shortfall" while "transformation initiatives in flight supported mgmt. reiterating its FY25 outlook across profitability metrics . . . ."

162. Similarly, UBS highlighted Alight's "mixed Q2 results and a disappointing 2025 top-line cut," as the basis for its price target declining 35%. Pertinently, the Analyst noted the Q2 result alongside the reduced FY25 guidance "provide a reset in expectations . . . ." The Analyst went on to highlight that Alight's "adj. EBITDA margin expanded +80bps YoY due to prior transformational initiatives . . . . [which] helped free cash flow conversion as Alight showcased some capital return with ~$20m buyback ($241m authorized) coupled with ~$22m dividends."

163. Furthermore, D.A. Davidson lowered its price target to $7 from $10, citing delayed closing on new deals and continued weakness in non-recurring project revenue. The analyst further stated: "Over the last 4-5 quarters, the company has experienced lower levels of non-recurring project revenue and they expect that to continue in the near-term. Management expects non-recurring project revenue will decline roughly 10%-12% in 2025."

164. The fact that these analysts, and others, discussed Alight's shortfall and below-expectation guidance revisions suggests the public placed significant weight on Alight's prior sales and growth estimates. The frequent, in-depth discussion of Alight's guidance confirms that Defendants' statements during the Class Period were material.

### B. Defendants Continue To Mislead Investors With September 4, 2025 Statements

165. On September 4, 2025, Heaton presented at the Citi 2025 Global TMT Conference. During the conference, Heaton opened by discussing how Alight was executing the initiatives stemming from the Divestiture and the Company's "transformation around the cloud

migration" to help it "return to growth" following the disappointing results it had reported to investors the previous month, stating, in pertinent part:

> Sure. I mean since really it was time to Dave joining, we had just divested the payroll and professional services business. And so right CEO, right time with -- we are an employee benefit services company enabled by great technology. And so we're smaller, we are more focused. ***And it's been back to basics of how we provide the best service we can to our current clients, how we leverage the domain expertise that we have with decades in this industry and retake our position in the market.***
>
> We've been the leader in the space for a very long period of time. I think the narrative became a bit mixed between the technology work that we had done since 2021 and who we are and what we do. ***And so I think resetting that narrative with the market, with the third-party evaluators, with our clients and then get back to operating the business and delivering on what we do every day for these clients growing the business, driving better retention of the current client base. And then a lot of what we've really we're benefiting now from the transformation around the cloud migration***, which was a huge lift for us over the last couple of years, which we're benefiting now.
>
> ***And the technology that we've got that now sets a platform in the cloud for AI technology for how we deliver better for our clients, the experience that their employees can see every day from Alight Worklife and what we're doing. And so it's very tactical in terms of the operations of this business right now***

166. The statements referenced in boldface in ¶165 were materially false and misleading when made because Defendants failed to disclose and/or misrepresented that:

(a) the Company was facing significant material undisclosed internal execution deficiencies following its Cloud Migration and Divestiture, including difficulties developing its AI-enabled technology, products, and services, which negatively impacted the Company's overall bookings and renewals or at least created a significant risk that they would decline; and

(b) the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among

experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel.

167. During the question-and-answer segment, Heaton emphasized the Company's focus on returning to growth through disciplined execution and continued strengthening of its sales and customer-retention efforts, in relevant part, as follows:

> First and foremost, return to growth is a key focus for us. And so we need to execute on the great pipeline that we've got. ***We've got great coverage in the market*** . . . ***We're bringing in a new Chief Commercial Officer. Again, this is not a revamp of a go-to-market, but really just focused on having the right domain expertise and industry expertise when it comes down to selling and closing deals . . . And again, we have a great pipeline***. We have the final stage within the pipeline is up 35%, which generally carries a much higher conversion of win rates. . . . ***The deals are there. We have a great team that's got great coverage in the market to build the pipeline. Again, back to a little bit of domain expertise to make sure we have the right people in the room and the right stages to close on those deals*** . . . ***We're very confident in terms of getting back to the target growth model in this business, even with thinking through the benefits of partnership.*** . . . ***That work will come back to us for sure. We get -- that is our work to do. We've got teams on the ground. And so they're still working with clients every day around that. . . . So it's really just execution, getting those deals to closing, which we've done. We had double-digit growth in ARR bookings last year. So we feel very confident in terms of our ability to close these deals. . . . We feel really good in terms of the retention side of this business. . . . We've got a team in place now with client management structure. . . . That team wakes up every day with our top 160 to 170 clients looking at how we're delivering for those clients, the services that we're providing, commitments that we made through the sales cycle that we need to make sure that we're delivering on from a product and delivery standpoint. . . . I mean we do have a great pipeline. We have an enterprise sales structure to get better coverage that we – it's a change we made back in 2023 to drive better coverage, top of funnel, more deals coming in, more deals qualified.***

168. The statements referenced in boldface in ¶167 were materially false and misleading when made because Defendants discussed the quality of Alight's sales team and its ability to close deals while failing to disclose and/or misrepresenting that:

(a) the Company was facing significant material undisclosed internal execution deficiencies following its Cloud Migration and Divestiture, including difficulties

developing and innovating its AI-enabled technology, products, and services, which negatively impacted the Company's overall bookings and renewals or at least created a significant risk that they would decline; and

(b) the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel.

169. Heaton also explained that the Company was leveraging significant industry expertise and relationships to build demand and strengthen its sales efforts:

> So David Essary, our new Chief Strategy Officer, comes in with just a ton of domain and industry expertise, has a number of big relationships within the space, and ***he's got a team now on the partnership side that's building a pipeline***. And so like I said, you expect to see more of a kind of continuum here for us on new partnerships, some within the space on the wealth side, others very big on the health side. But just, again, ***there's an element of demand that we see now*** because, again, with the distribution of $35 million, if you're a young kind of a growing upstart program in the health or wellness space, getting that distribution, I mean, is a huge growth opportunity to join our network.

170. The statements referenced in boldface in ¶169 were materially false and misleading when made because Defendants touted Alight's sales team "building a pipeline" and the "demand" for its products while failing to disclose and/or misrepresenting that:

(a) the Company was facing significant material internal execution deficiencies following its Cloud Migration and Divestiture, including difficulties developing and innovating its AI-enabled technology, products, and services, which negatively impacted the Company's overall bookings and renewals or at least created a significant risk that they would decline; and

(b) the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel.

171. Toward the end of the question-and-answer session, Heaton explained the basis for the optimistic outlook, stating, in relevant part:

> <A: Jeremy J. Heaton> It certainly has – I'd say I start with retention. I mean I think when you need to reset the narrative for the company, it has to start with -- I mean, the third-party evaluators, 3 of whom were on stage with us at Investor Day, there was a reengagement that happened when Dave came in, given his relationships in the space. They sit across probably 75% of the revenue on our large enterprise clients. ***There's -- success happens when they're with us where they understand who we are, where we're going as a company, where we're focused***. I was on a call with one of the 3 on Thursday last week, talking through the elements of our business and what we were doing, gave me a great opportunity to ask them how we're doing, right, and hear the positive feedback from them and how we're showing up and what we're doing for clients today and where we're at in the market.
>
> ***So it's very positive from them***. Again, it's a longer sales cycle. So this takes a little bit of time of that reengagement, that showing the proof points of what we can do and how we're showing up for either new deals as well as how we're delivering for current clients and our client reference points and the beginnings of those proactive discussions on large enterprise clients who are either coming to market now or probably coming to market in the next 12 months. And so – that's a big deal, I'd say, right now in retention, and it's a bigger deal in the go forward in terms of deals that come to market just given the sales cycle.
>
> ***So going well***. And listen, we still have to -- again, ***from the AI transformation, what we can do on the product and technology side, delivering for clients, the integrated nature of delivery and everything that we're doing around the COEs makes that a more seamless feel for clients and the TPEs see that as well***. And so those are the big elements. ***That's -- they still want to see us continue to execute and evolve on that side.***

172. The statements referenced in boldface in ¶171 were materially false and misleading when made because Defendants discussed Alight's "AI transformation" and making the client experience "seamless" but failed to disclose and/or misrepresented that:

(a) the Company was facing significant material internal execution deficiencies following its Cloud Migration and Divestiture, including difficulties developing its AI-enabled technology, products, and services, which negatively impacted the Company's overall bookings and renewals or at least created a significant risk that they would decline; and

(b) the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel.

## C. Defendants Continue To Mislead Investors With November 5, 2025 Statements

173. On November 5, 2025, Alight issued a press release disclosing the Company's third quarter fiscal results, which revealed below-projection financial results and a reduction of its full-year guidance, in addition to another noncash goodwill impairment charge of $1.3 billion. Guilmette was quoted in the release, as saying that the company had "***seen a favorable step-change in accelerating our client management and delivery capabilities, and reimagining the client and participant experience in line with our long-term strategy***."

174. During the corresponding earnings call (the "Q3 2025 Earnings Call"), Heaton discussed the second huge noncash goodwill impairment charge Alight took in just 3 months, stating:

> While having strong confidence in the long term, ***with our market valuation change over the past quarter, combined with current business trends, we recognized a noncash goodwill impairment charge of $1.3 billion***.

175. The statements referenced in boldface in ¶174 were materially false and misleading when made because Defendants described the $1.3 billion noncash goodwill impairment charge vaguely as the result of "our market valuation change over the past quarter, combined with current business trends[.]" No explanation of "current business trends" was provided. However, as was the case with Alight's previous goodwill impairment charge of nearly $1 billion, once again, none of Alight's publicly traded competitors (ADP, Conduent, Voya, WTW, HealthEquity) took a goodwill impairment charge for that time period attributable to "current business trends", which one would expect them to do if "current business trends" were a cause. Thus, it was false and misleading to attribute the impairment charge to those factors when in reality it was due to Alight-specific significant material operational and execution problems. Specifically:

(a) the Company was facing significant material undisclosed internal execution deficiencies following its Cloud Migration and Divestiture, including difficulties developing its AI-enabled technology, products, and services, which negatively impacted the Company's overall bookings and renewals or at least created a significant risk that they would decline; and

(b) the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel.

176. Heaton discussed the Company's disappointing financial results the came in below their projections and the basis for the guidance cut, while continuing to tout the Company's long-term prospects, in pertinent part, as follows:

> Nonrecurring project revenues were down $7 million or 14% for the quarter. Adjusted gross profit was $206 million, up 3% from the prior year, reflecting 260 basis points of margin expansion. Similar to prior quarters, our adjusted gross profit is impacted by costs to support the divested business, which are reimbursed through the TSA and other income. Normalized for this, adjusted gross profit would have been higher by $7 million. Adjusted EBITDA was $138 million for the quarter, up 17% and adjusted EBITDA margin expanded 460 basis points. Free cash flow for the first 9 months was $151 million, up 45% from the prior year period. Given the business trends this year versus expectations, our profitability and cash flow results include a nonrecurring impact of lower variable and performance-based costs.
>
> While we've made tremendous progress, there is more work ahead to improve our top line results**.** Longer term, we expect improved commercial results with an optimized go-to-market function along with key product enhancements. We feel good about our renewal rates in the large market and expect the 2026 cycle to have over 30% fewer dollars up for renewal. We also have near-term revenue opportunities through in-year bookings, partnerships and engagement services that our team is highly focused on to close out the year. Our operational and technology initiatives continue to drive increased efficiency while delivering a better experience for our clients, and this has benefited our profitability and cash flow metrics.
>
> . . .
>
> We returned $47 million to shareholders this quarter via our quarterly dividend and through the repurchase of $25 million worth of shares. Year-to-date, we've repurchased close to 14 million shares or approximately 3% of shares outstanding. We ended September with $216 million remaining on our share buyback authorization. Management and the Board of Directors will continue to evaluate our capital allocation policy as it does on an ongoing basis. With today's earnings report, we have updated our 2025 outlook and enter the quarter with $2.25 billion of revenue under contract.
>
> For the year, we expect revenue between $2.25 billion and $2.28 billion, adjusted EBITDA of $595 million to $620 million, free cash flow of $225 million to $250 million and EPS of $0.54 to $0.58. **We are intensely focused on execution and improving our top line performance and remain confident in our position for the long term.**

177. Defendants expanded on the reduced projections during the question-and-answer segment of the call and the additional goodwill impairment, in pertinent part, as follows:

> <Q: Kyle David Peterson – Needham & Company, LLC – Research Division> I wanted to start on the update to the guide, see if you guys could walk us through some of the moving pieces on the reduction here. It looks from the slides, it looks like it's from kind of a combination of volumes and new business wins. But I guess any clarity or context as to what you guys are seeing and when -- at least on the new business wins, obviously, you made some announcements during -- in the release today. But I guess like when should some of the fruits from those wins start to pay dividends?
>
> <A: Jeremy J. Heaton> Sure. I'll start, Kyle. So yes, still in the guide, we reduced at the midpoint revenue down $40 million. It's really split between project and recurring. Project is the biggest with, again, a $20 million update there on project. And we just have not seen an inflection in pipeline and activity. **I think some continued cautiousness as we're going through the annual enrollment process right now.**
>
> So even on a low comp, we had expectations to see more build in the pipeline coming into the fourth quarter and just not seeing that. On the recurring side, it's a bit of volumes. You see in the update in the deck that we've got. Some in that is really – we've seen modest declines so far year-to-date, but just a sentiment overall, just a cautiousness around that. We're not going to certainly expect with the headlines, see any upside there. So really just expecting flat to slightly down on the volume side. The Strada update on the customer care agreement was impacted in the third quarter, and so that's part of the update as well as going through. And as you said, a small amount of just the in-year revenue from the bookings that we've had so far this year.
>
> . . .
>
> <Q: Kyle David Peterson> Okay. That's helpful. And then maybe just a follow-up. I want to see if you guys are seeing any impact or whether it's client decision-making around open enrollment related to the government shutdown. Obviously, it's been getting kind of long in the tooth here. But I guess, any impact on your business, client decision-making, employee decision-making? Anything you guys are seeing? Or so far, has it been something you guys have been able to work through?
>
> <A: David D. Guilmette> Kyle, it's Dave. Thank you for the question. Let me take that. So as Jeremy mentioned, you've got a few of the headlines that are out there. **But in general, whether it's the government shutdown and the impact on federal employees or it's what passes through to clients, we've really not seen anything material come through at this stage. And just keep in mind**

**that even if there is an action, a reduction in force with a big company, there's a pretty big lag factor associated with that.**

You'll have individuals who will be on COBRA for a period of time. Sometimes they're furloughed, so they're still sort of there. So -- or in the case of the federal government, you've got people working and not being paid in some circumstances. **So longer term, the volume that would typically tick up, we're not anticipating, but we haven't really seen a material negative impact, at least through this quarter, and we're not envisioning that through the fourth quarter.**

. . .

<Q: Kevin Damien McVeigh – UBS Investment Bank – Research Division> . . . I mean, you had 2 consecutive meaningful impairments. You've guided down 2 consecutive quarters. Just help us understand just the modeling on the guidance relative to where you're coming in, particularly given we're 9 months into the year because it just continues to be an issue in terms of how you're guiding.

<A: Jeremy J. Heaton> Sure. I think the guide, and as I just walked through briefly, I think in the fourth quarter, the biggest piece is the project revenue, which I would say is we've never seen levels this low in terms of project revenue. We did expect and our teams going through with clients every day as we build through kind of the second half of the year in terms of where that pipeline is. It's well below our expectations in terms of project revenue.

**So absolutely, that's the biggest piece coming through here. There's also the impacts of what we've talked about in terms of the bookings element that we have and just the macro factors around the headlines around employee and participant counts. So those are the biggest pieces for us in the guide.** As you can see in the transcript we talked about this morning, we are at $2.25 billion of revenue under contract coming into the quarter, and the range on the guide is $2.25 billion to $2.28 billion. So I think as you think about this, this is what we see today in terms of what's in front of us for execution in the -- at the end of the quarter.

**On the impairment side of it, that's a factor of, again, noncash impairment -- accounting adjustment, largest piece being just the valuation change of the company through the quarter. And that's – there's a market valuation test, which is done every quarter. It's normal course controls that we have around the financials and need to go through the valuation process. That takes into account the trends that we do see in the business, but it's a much longer-term view taking in the market cap and market value of the company. So we recognized that charge here this quarter in line with where we closed out the quarter from a valuation of the company.**

178. The statements referenced in boldface above in ¶¶176-77, were materially false and misleading when made because Defendants failed to disclose and/or misrepresented that:

(a) The Company was facing significant material internal execution deficiencies following its Cloud Migration and Divestiture, including delays in closing deals for new and existing business, which delayed project start dates and deferred revenue recognition, as well as difficulties developing and innovating its AI-enabled technology, products, and services; and

(b) The Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel.

**D. Defendants Continue To Mislead Investors With December 2, 2025 Statements**

179. On December 2, 2025, Heaton participated in the UBS Global Technology and AI Conference at the Phoenician. During the conference, Heaton touted the Company's operational execution, client retention, and new bookings, attributing those achievements to the Company's "transformation work," which he represented was improving margins and free cash flow, stating, in pertinent part:

> ***Much of what we've got and what we've laid out earlier this year at Investor Day and going forward is execution, around the growth of the top line of the company. I mean that is, for sure, #1 priority. It is back to growth. Within that is service delivery at a very high level, retention of the key clients that we have today, 50% of the Fortune 500 and new bookings. So winning new deals, build bigger pipeline really in the large and jumbo market is really where from a positioning standpoint is where our history is. And so a real focus there. But I would say 80% execution on our side.*** There's certainly a bit of macro, which we can talk through as well within this business. But much of what we laid out and feel good about is a lot of the transformation work happening that drives the top

> line, but also drives the margins and free cash flow in this business. . . . ***[W]e feel good about many of the operating aspects of this business . . . But many of the initiatives for us from the operational side, the operating model and how we're delivering services for clients and the results we're seeing in terms of client satisfaction has been a big positive for us in terms of what we see this year. . . . And so we feel really good in terms of those being the big drivers that we laid out and, one, being best in market in terms of that experience and then the margins*** *and cash flow profile* ***of what this looks like from the business going forward. . . . The team has been tremendous in the execution around the operating model.***

180. Heaton also acknowledged that while bookings had previously underperformed the Company's plan, management had taken corrective action by rehiring a seasoned sales executive to reinvigorate the sales function and drive an inflection in ARR bookings in 2026, stating, in pertinent part:

> Commercially, we brought in Steve Rush. We have had bookings much lower than our plan was for this year. And so commercially, to reinvigorate the go-to-market structure, bring in more domain expertise, we brought Steve Rush back in as our Chief Commercial Officer, back in October. He has 2 decades with Alight and its predecessor companies, a ton of domain expertise. He is the sales leader when we talked about deals like the GEs, the Fortune 10s, the big logos we had talked about over the past 2 to 3 years, Steve was on most of those deals. And so he knows how to – when I talk about the large market, the jumbo market, ***he's aligning the teams to, one, close the deals that are in the late-stage of the pipeline right now for us, but drive an inflection in what we're seeing around the ARR bookings in 2026.***

181. The statements referenced in boldface in ¶¶179-80 were materially false and misleading when made because Defendants falsely touted the "operating model and how we're delivering services for clients and the results we're seeing in terms of client satisfaction" and the team's "tremendous" "execution around the operating model" and closing deals while failing to disclose and/or misrepresenting that:

(a) the Company was facing significant material internal execution deficiencies following its Cloud Migration and Divestiture, including difficulties developing and innovating its AI-enabled technology, products, and services, which

negatively impacted the Company's overall bookings and renewals or at least created a significant risk that they would decline; and

(b) the Company was facing significant material operational deficiencies with the organization and execution of its sales team, including an inexperienced workforce, inadequate employee training, and substantial turnover among experienced personnel and, as a result, incurred significant additional compensation expenses to hire, retain, and incentivize sales personnel.

## VII. THE TRUTH IS FINALLY DISCLOSED TO INVESTORS

182. Investors finally learned the full extent of Alight's significant material execution, operational, and financial deficiencies on February 19, 2026, when the Company published its fourth quarter and full year fiscal 2025 results. Defendants disclosed that for both Q4 of 2025, and the fiscal year 2025, its financial results were well below both street forecasts and Defendants' own prior projections. In pertinent part, Defendants posted results as follows:

> **Fourth Quarter 2025 Highlights** (all comparisons are relative to fourth quarter 2024)
>
> - Revenue decreased 4.0% to $653 million.
> - Gross profit of $240 million and gross profit margin of 36.8%, compared to $271 million and 39.9% in the prior year period, respectively, and adjusted gross profit of $272 million and adjusted gross profit margin of 41.7%, compared to $300 million and 44.1% in the prior year period, respectively.
> - Net loss of $933 million compared to the prior year period net income of $29 million, primarily driven by a $803 million non-cash goodwill impairment charge.
> - Adjusted EBITDA of $178 million compared to the prior year period of $217 million.
> - Diluted earnings (loss) per share of $(1.78) compared to $0.05 in the prior year period, and adjusted diluted earnings per share of $0.18 compared to $0.24 per share in the prior year period.
> - Declared and paid a $0.04 per share dividend.
>
> **Full Year 2025 Highlights** (all comparisons are relative to full year 2024)
>
> - Revenue decreased 3.0% to $2,262 million.

- Gross profit of $765 million and gross profit margin of 33.8%, compared to $794 million and 34.0% in the prior year period, respectively, and adjusted gross profit of $883 million and adjusted gross profit margin of 39.0%, compared to $904 million and 38.8% in the prior year period, respectively.
- Net loss of $3,078 million compared to the prior year period net loss of $140 million, primarily driven by the $3,124 million non-cash goodwill impairment charge.
- Adjusted EBITDA of $561 million compared to the prior year period of $556 million.
- Diluted earnings (loss) per share of $(5.83) compared to $(0.25) in the prior year period, and adjusted diluted earnings per share of $0.50 compared to $0.48 per share in the prior year period.
- Repurchased $65 million of common stock under existing share repurchase program.

183. The release further disclosed that Alight would "replace its cash dividend with more efficient capital allocation activities, including deleveraging the balance sheet and, subject to market and other conditions, for share repurchases."

184. On the same day, Alight held an earnings call with analysts and investors hosted by the Company's new CEO Rohit Verma who reiterated the new management's disappointment with the prior year's results, disclosing that "[i]n 2025, we did not meet our internal financial targets and new bookings and renewals did not meet our expectations, leading us to miss our forecast to the market." Verma further disclosed that the Company "had a less than stellar renewal season last year[.] I would say that typically, we want to target our renewals at the mid- to high-90s[. W]e were significantly below that number." Because of these disappointing results, Verma noted that the Company's "immediate focus is driving service and operational excellence across our unmatched portfolio of benefit solutions, innovating products enabled by AI to create a cutting-edge user experience, real value and actionable insights for clients and participants, while building relationships that result in enduring trusted partnerships with clients, participants and partners." While Verma was hesitant to issue future guidance "[g]iven that we missed

guidance targets several times in 2025," he explained to investors that the Company "expect[s] first quarter 2026 revenue to be down by high single-digit percentage range. . . . [and that its] planned investments in sales, account management and user experience will create short-term adjusted EBITDA margin pressure, resulting in a decline of 500 to 750 basis points as compared to last year's first quarter."

185. Alight's newly appointed Interim CFO, Gregory Giometti, then took over the call to detail the financial figures underpinning Alight's earnings shortfall, stating, in pertinent part, as follows:

> Turning to our fourth quarter results. We continue to think about revenue mix across 2 categories: recurring renewable business and nonrecurring project-based work. Revenue for the fourth quarter was $653 million. Recurring revenue of $607 million was down 1.6% compared with the prior year period. Project revenue of $46 million was down 27%. Fourth quarter adjusted gross profit was $272 million, down 9.3% from the prior year period, reflecting an adjusted gross profit margin decline of 240 basis points. Adjusted EBITDA for the fourth quarter was $178 million as compared to $217 million in the prior year period. Fourth quarter 2025 adjusted EBITDA margin was 27.3% compared to 31.9% in the prior year period.
>
> Adjusted EBITDA during the fourth quarter of 2025 was adversely impacted by increased compensation expense, which we believe is critical to executing on our priorities. This impacted adjusted EBITDA by approximately $45 million. Excluding this, adjusted EBITDA would have been within our previously communicated guidance range. Adjusted net income in the fourth quarter was $96 million with adjusted EPS of $0.18 compared to $127 million of adjusted net income and adjusted EPS of $0.24 in the fourth quarter of 2024.
>
> Looking at the full year, total revenue was approximately $2.3 billion. Recurring revenue of approximately $2.1 billion was down 2.2% compared to the prior year period. Project revenue of $154 million was down 22%. Adjusted gross profit for the full year was $883 million compared to adjusted gross profit of $942 million in 2024. Full year adjusted gross profit margin decreased 100 basis points compared to 2024. Full year adjusted EBITDA was $561 million with adjusted EBITDA margin of 24.8% compared to adjusted EBITDA of $594 million with adjusted EBITDA margin of 25.2% in 2024. Adjusted net income for the full year was $266 million with adjusted EPS of $0.50 compared to $313 million of adjusted net income and adjusted EPS of $0.57 in 2024. In the fourth quarter of 2025, we recognized a noncash goodwill impairment charge of $803 million. We have remaining goodwill of $83 million on the balance sheet.

186. During the question-and-answer segment, the new management further clarified some of the shortcomings of their predecessor's actions, in pertinent part, as follows:

> <Q: Peter Corwin Christiansen – Citigroup Inc. – Research Division> So the messaging on the scale, the partner ecosystem, the mission-critical platform capability, this has been quite consistent with the prior execution teams here. But there's been a real gap between this sentiment in the asset value of the company and the core financial performance. It has been regular misses on client retention, pipeline conversion and any stability to growth. Recognize that you've been in the role for 30 days, but I was just -- I had 3 questions. I'm just curious, what's your take on what are -- what have been some of the drivers in some of the financial underperformance in recent periods?
>
> Second question, your experience previously CEO at Crawford, what do you bring to the table in terms of being able to turn around the company? Just curious on that perspective. And then final, I understand this is yet another transition year for the company. How should we think about measuring any milestones in the next 12 months? I appreciate it.
>
> <A: Rohit Verma> Thank you, Peter. Great set of questions. So let me start from the top, right? What do I think are the drivers for the financial underperformance[.] First and foremost, I had a hypothesis when I was coming into the organization. And that hypothesis was, as you stated, right, we're in a great industry. We've been here for a long time. Our brand is well recognized. We've got an enviable client base. And we have a service that if we execute well, it should be sticky. 30 days in, I have only strengthened that conviction, right, which is that those things are absolutely correct. Obviously, while coming in, I also knew that financially, we had not performed to the expectations of the organization as well as that of the Street and that also I have seen. I would say the biggest challenge for us has been on driving operational excellence, which to me is an execution piece, right? So this is not a change in the strategic direction of the company.
>
> This is a change in the execution of the company. So the biggest piece that we need to tighten is around execution. It's execution around operational excellence. It's execution around client management and relationship management, it's execution around technology and it's execution around continuing to innovate our products and services. So that, to me, are the 3 biggest pieces, right, that we have to push on. That leads me into my experience as the CEO at Crawford. When I joined Crawford, right, we had not grown for 10 years.
>
> . . .
>
> <Q: Peter Heckmann – D.A. Davidson & Co. – Research Division> Rohit, congrats on the new role. I think it's good to have you as the firm and look forward to working with you. I think the termination of the dividend program

> right after that was the right decision. And as we look into some of the initiatives here that we've just talked about, the additional comp in the fourth quarter of '25 and then the $100 million of incremental investment spend in certain areas, I guess, what portion of both of those do you view as recurring versus onetime? And in terms of the $100 million recurring, would you expect that to be front-end loaded in 2026?
>
> <A: Rohit Verma> Great question, Peter. Thank you so much, and I look forward to meeting you as well. Peter, the way I would think about it is that the $100 million is not an additional investment. It is the CapEx that we have planned for this year. It's the capital investment we've planned for this year. Do I expect it to repeat it? I expect some part of it to repeat, right, because a lot of these things that we're trying to do aren't going to be done in 1 year. But as I had answered to Peter from Citi before that this has been an execution journey for us or this will be an execution journey for us and a large part of that depends on us doing -- bringing about changes in our processes, bringing about changes in our systems and modernizing those things to really meet the needs and asks of our clients.
>
> As far as the nature of the compensation, I do expect that to be recurring. And the reason I say that is because we are adding more horsepower from a sales management perspective. I want to make sure that individuals are incentivized for driving execution. And because I want execution to be the way we do business, I expect that part of the expense to be recurring.

187. As a result of this news, the price of Alight common stock dropped from a closing market price of $1.31 per share on February 18, 2026, to $0.81 per share on February 19, 2026, a decline of 38% in the span of one day.

188. A number of well-known analysts who had been following Alight lowered their price targets in response to Alight's disclosures. For example, DA Davidson, which cut its price target 40%, highlighted the revenue and earnings shortfall, with margins "pressured in the period by lower overall revenue as well as higher compensation expense." Detailing the results, the Analyst's report highlighted that "[p]roject revenue was the primary drag to total revenue in the 4Q, falling 27% Y/Y"; notably, "project revenue fell 10% Y/Y to $197M" in 2024, followed by "an additional 22% Y/Y to $154M in 2025." The Analyst also highlighted that the "Board terminated the company's quarterly dividend program," fell short of providing any guidance for

Fiscal 2026, and "recognized a non-cash goodwill impairment charge of $0.8B," bringing the total annual impairment to $3.1B in 2025.

189. Citi had some harsher words for the Company's challenges, calling it "the classic definition of a value trap." The Analyst highlighted that the Company's "fourth CEO since 2018 has only started assessing 'execution' driven challenges" and notes that Citi "no longer see[s] a pathway for the stock to return to previous levels soon." The Analyst went on to highlight that "Project revenue decline 27% YoY," noted the adjusted EBITDA and adjusted EPS shortfalls, and acknowledged that Alight was "eliminating the regular dividend[.]" Citi's Analyst resultantly slashed their price target for Alight by more than 84% to only $1.00.

190. J.P. Morgan similarly expressed skepticism following Alight's fourth quarter 2025 results, publishing a report titled "4Q25 Recap: Cutting Estimates Again As We Await More Details On Turnaround Plan." The analyst emphasized that reduced financial visibility would likely keep investors "on the sidelines," citing another quarter of declining revenue, EBITDA and EPS misses, an $805 million goodwill impairment, the Company's decision to withhold 2026 guidance, and the elimination of its cash dividend. J.P. Morgan further warned that 2026 revenue under contract was already approximately 5% below 2025 levels, reflecting continued customer attrition. The analyst also reduced its 2026 and 2027 adjusted EPS estimates by approximately 48% and 52%, respectively, and concluded it had "low confidence in forecasting beyond 1Q[.]" The analyst also added: "The CEO change compounds the uncertainty. A re-rating may be harder to earn until a track record under new leadership is established."

191. The fact that these analysts, and others, discussed Alight's revenue and earnings shortfall, sudden CEO and CFO transitions, elimination of the recently instituted dividend, and

overall execution missteps and challenges suggests the public placed significant weight on Alight's statements of prior confidence in their new growth plans. The frequent, in-depth discussion of Alight's repeated shortfalls and missed guidance confirms that Defendants' statements during the Class Period were material.

192. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Alight's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

193. During the Class Period, Defendants acted with scienter in that they knew, should have known, or were deliberately reckless in not knowing, that the public statements disseminated to the investing public in the name of the Company, or in their own names, were materially false and misleading when made. Defendants had actual knowledge of, or access to, non-public information concerning the Company's growth prospects, including, but not limited to: the Cloud Migration and Divestiture; the inability of its salesforce to execute and deliver on those initiatives; the significant material operational deficiencies affecting Alight's workforce; the impact of the dividend on Alight's ability to reinvest in its salesforce and the conditions of its employees' employment, including the compensation and incentives designed to facilitate such execution; the Company's ability to maintain its return of capital to shareholders through Alight's announced quarterly dividend program; the Company's ability to stabilize project revenue growth while maintaining its high retention rate to support continued ARR growth; the fair value of its Health and Wellness Solutions reporting unit; and the foregoing's impact on the Company's ability to meet its projected targets for project revenue, ARR, EBITDA, EPS, and free cash flow.

194. Defendants knew and/or recklessly disregarded the false and misleading nature of the material information they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

195. The Individual Defendants, because of their positions in Alight, controlled the contents of Alight's public statements during the Class Period. The Individual Defendants were each provided with or had access to the material information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their position and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of the Defendants is responsible for the accuracy of Alight's corporate statements and, therefore, is responsible and liable for the representations contained therein.

196. The following facts support a strong inference of scienter, when viewed holistically and in the context of this amended pleading.

### A. ***Respondeat Superior*** and Agency Principles Apply

197. Alight is liable for the acts of the Individual Defendants under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment or agency without authority or apparent authority to do so. The scienter of the Individual Defendants is similarly imputed to Alight under *respondeat superior* and agency principles.

### B. The Individual Defendants Had Access To Material Information That Their Statements Were False Or Misleading

198. As alleged throughout this Complaint, during the Class Period, Defendants had actual access to material information demonstrating that their statements that the Company's operations and execution following its Cloud Migration and Divestiture positioned the Company for financial success across a variety of key financial metrics and enabled it to maintain a return of capital to shareholders through a quarterly dividend program were false and misleading when made.

199. For example, Guilmette described his own hands-on assessment of the Company's core business immediately upon becoming CEO:

> One of the first things I did when I came on as CEO was take a hard look at what do our solutions look like, what do we have, how are we going to market. . . . [T]he core aspects of what we have in Alight today as a services company, delivering employee benefits[,] is best in class . . . .

200. As the Class Period unfolded, Guilmette continued to describe his day-to-day oversight of the Company's cloud infrastructure and emphasized its importance at a May 14, 2025 conference, stating: "when I started, it was a priority, and it's only become a bigger priority. . . . [A]s we've migrated from the installed databases to the cloud, we were able to organize and clean that data . . . ***I'm taking our team literally every day through*** [thinking about] what's the space going to look like in 2027, 2028 . . . ."

201. Heaton also described an internal client-monitoring structure that gave him direct visibility into the true state of Alight's service delivery. For example, at the Company's September 4, 2025 conference, Heaton explained: "We've got a team in place now with client management structure. . . . That team wakes up every day with our top 160 to 170 clients looking at how we're delivering for those clients, the services that we're providing, [and] commitments that we made through the sales cycle . . . ."

202. After some of the Company's struggles were revealed to the market, Guilmette acknowledged at the Q2 2025 Earnings Call that his immediate personal attention was fixed on solving these deficiencies when he stated: "our operational improvements are well on track, we are making significant progress in accelerating our strategy through AI and strategic partnerships and we are ***laser-focused*** on improving our commercial execution and top line growth," and that "***[t]he success of the commercial team is a top priority of mine*** . . . ."

203. Additionally, Guilmette and Heaton cited specific, granular internal metrics about the Cloud Migration's performance, the kind of data that could come from only close, personal monitoring of the platform's actual operation rather than a passive review of Company-wide summaries. At the May 14, 2025 conference, Guilmette vouched for the platform's technical stability in terms directly contradicted by CW1's contemporaneous account:

> the movement in the cloud migration . . . allowed us to be able to retire our data centers and have . . . really all the advantages of being on the cloud. One example of that is just system stability, which led to probably the cleanest annual enrollment we've experienced in our history. We saw a 12-point increase in NPS score related to annual enrollment. And that's massive. And the system was operational, I think, all about 1 minute or 1.5 minutes during that annual enrollment cycle, which really hadn't happened before.

204. Heaton, for his part, walked investors through the exact dollar figures by which the Cloud Migration fed the Company's financial guidance. At the March 20, 2025 Investor Day, he stated:

> if you think about margins, it's really 2 buckets I have you think about it in. The top of this page is the work we've already done. . . [We get] $75 million of benefits . . . from completing the cloud migration. We've rationalized vendors, functional spend, simplifying the company after the divestiture. That work is largely done, and it's included in the guidance that we gave for 2025.

205. The Individual Defendants' access to information about the Company's operational and execution failures, and its resulting subpar finances and inability to maintain a return of capital to its shareholders through its dividend program can also be inferred through

their positions as CEO and CFO, each requiring them to periodically update the market about the Company's finances and internal operations. In order to adequately prepare for these engagements, Defendants had access to materials containing information related to the Company's business operations and finances—including internal memoranda, the Company's balance sheet and other pertinent financial documents that would have necessarily revealed the active state of Alight's business operations, internal execution efforts, project revenue, ARR, EBITDA, EPS, capital expenditures, compensation expenses, free cash flow, and its ability to maintain the return of capital to shareholders through Alight's quarterly dividend program.

### C. The Fraud Implicated Alight's Core Operations

206. The fraud alleged herein implicates the core operations of Alight. As discussed *supra*, Alight's Employer Solutions segment accounted for the overwhelming majority of the Company's revenue: approximately 85.8% for fiscal year 2021, 86.8% for fiscal year 2022, and 86.9% for fiscal year 2023. Following the July 2024 Divestiture, Employer Solutions became Alight's sole remaining reportable operating segment and the source of substantially all of its ongoing revenue. The transformation of the Employer Solutions into a cloud-based, AI-enabled platform were not peripheral technology upgrades; they were, in Defendants' own words, the foundation on which the entire post-Divestiture Company was built.

207. The scale of the undertaking underscores its centrality to the business Guilmette and Heaton were running. Defendants described the Cloud Migration as "a 4-year technology journey," "a very significant investment," and "[n]ot for the faint of heart." They likewise told investors the completed Cloud Migration would achieve "$75 million in annualized savings," and "a 40% reduction in the number of servers," "a 60% reduction in middleware systems," "a 43% faster average response time across Health Enrollment pages," and "a 30% faster average load time for the Alight Worklife homepage."

208. The transition away from Professional Services and toward a cloud-based, AI-enabled Employer Solutions model was thus the Company's single most important strategic initiative, and Guilmette and Heaton held themselves out as the executives most knowledgeable about it. Both highlighted the Cloud Migration and its purported benefits at nearly every earnings call and investor presentation during the Class Period,[13] repeatedly tying the Cloud Migration to the Company's dividend program, margin guidance, and free cash flow targets.

209. Guilmette described the Cloud Migration as the foundation of Alight's entire identity and strategy. For example, at the Company's February 20, 2025 earnings call, he told investors:

> 2024 was a year of transformation for Alight as we reposition[ed] the company for long-term success. We've concluded our technology transformation journey with the completion of our cloud migration, divested Payroll & Professional Services to simplify our business model and evolved our leadership structure. Together, these milestones have collectively reset Alight's foundation.

210. At the Company's March 20, 2025 investor day conference, the first slide of the presentation entitled "What you should take away from today" highlighted the Alight Worklife platform and AI capabilities. The presentations goes on to present the benefits of "generative AI", "AI and automation yield positive outcomes for Alight and client", highlights that innovation for the future involves "AI-driven advancements".

211. Later that year, at the December 2, 2025 conference, when asked whether the CEO transition reflected "macro or a change in direction for Alight," Heaton stated: "Much of what we've got and what we've laid out earlier this year . . . is execution, around the growth of the top line of the company. I mean that is, for sure, #1 priority. It is back to growth."

---

[13] These statements include those made to investors on November 12, 2024, February 20, 2025, March 20, 2025, May 8, 2025, May 14, 2025, August 5, 2025, September 4, 2025, and November 5, 2025.

**D. Defendants' Financial and Health-Solutions Based Experience**

212. Defendants were highly educated, trained, and experienced in finance, business, and healthcare solutions, were well-versed in the customs and practices of their industry, and therefore were aware of the significant transformation initiatives underway at Alight when they joined the Company, any issues affecting the Company's execution of those initiatives, and the impact its execution had on the Company's financial performance and ability to meet its financial projections, or, if they were not so aware, knew that the investing public expected them to keep themselves abreast of such matters.

213. Defendant Guilmette has over 40 years of experience in building, leading, and transforming global healthcare and employee benefits businesses. Dave Guilmette, LinkedIn. https://www.linkedin.com/in/dave-guilmette/ (last visited Aug. 5, 2025) ("Guilmette LinkedIn Profile"). He joined Alight as CEO in August 2024. *Id*. At Alight, he served as CEO & Vice Chair of the Board from August 20, 2024 to December 31, 2025. David D. Guilmette Professional Summary, S&P Global Market Intelligence, https://www.capitaliq.spglobal.com/apisv3/spg-webplatform-core/company/officerBio?ID=14092075&SNL=True&Type=0&KP=1555877 (last visited Aug. 5, 2026). He also served as an Independent Director for Alight from May 5, 2024 to August 2024. *Id.* Prior to joining Alight, Guilmette served as CEO of Aon's Global Health Solutions business—the company whose HR business Alight acquired to establish itself as an independent company. Guilmette LinkedIn Profile. Before working at Aon, he served as the President of Global Employer Segment of The Cigna Group for over eight years. *Id.* Guilmette holds a B.A. in Political Science and Government from the University of Chicago. *Id.*

214. Defendant Heaton had been with Alight for approximately six years and has significant experience and knowledge of healthcare and corporate finance. Jeremy Heaton,

LinkedIn. https://www.linkedin.com/in/jeremy-j-heaton/ (last visited Aug. 5, 2026). ("Heaton LinkedIn Profile"). He was Alight's Operating Chief Financial Officer until May 8, 2024 and then served as its Chief Financial Officer until January 9, 2026.[14] Jeremy J. Heaton Professional Summary, S&P Global Market Intelligence, https://www.capitaliq.spglobal.com/apisv3/spg-webplatform-core/company/officerBio?ID=14092075&SNL=True&Type=0&KP=2919168 (last visited Aug. 5, 2026). In this role, he led day-to-day financial activities and worked closely with the Global Chief Financial Offer on overall financial strategy. *Id.* Prior to that, Heaton served in various CFO and business executive roles at GE Capital for approximately ten years before serving as a Transition Leader at GE Healthcare for just under two years. Heaton LinkedIn Profile. Heaton holds a B.S. in Finance from the University of Florida. *Id.*

**E. The Individual Defendants' Compensation Structure Supports Scienter**

215. The Individual Defendants were part of the 2021 Omnibus Incentive Plan (the "2021 OIP"), which would have allowed them to receive equity and cash-based returns. Specifically, the 2021 OIP consists of "Incentive Stock Option, Nonqualified Stock Option, Stock Appreciation Right, Restricted Stock, Restricted Stock Unit, Other Equity-Based Award, and Other Cash-Based Awards." The terms of the program state that such awards "shall vest and become exercisable" if the Company achieves certain "Performance Conditions" including:

> (i) net earnings, net income (before or after taxes), adjusted net income after capital charges or consolidated net income; (ii) basic or diluted earnings per share (before or after taxes); (iii) net revenue or net revenue growth; (iv) gross revenue or gross revenue growth, gross profit or gross profit growth; (v) operating income or net operating profit (before or after taxes); (vi) return measures (including, but not limited to, return on investment, assets, capital, employed capital, invested capital, equity, or sales); (vii) cash flow measures (including, but not limited to, operating cash flow, free cash flow, or cash flow return on capital), which may be, but are not required to be, measured on a per share basis; (viii) actual or adjusted earnings before or after interest, taxes, depreciation, and/or amortization

[14] As discussed *infra*, the Company announced Defendant Heaton's resignation on December 18, 2025, which became effective on January 9, 2026.

> (including EBIT and EBITDA) or earnings before interest, taxes, depreciation, amortization and restructuring costs (EBITDAR); (ix) gross or net operating margins; (x) productivity ratios; (xi) share price (including, but not limited to, growth measures and total stockholder return); (xii) expense targets or cost reduction goals, general and administrative expense savings; (xiii) operating efficiency; (xiv) objective measures of customer/client satisfaction . . . .

216. As a result, the Individual Defendants had a direct financial incentive to cause Alight's share price to appreciate based on the very performance metrics about which they misled the market, thereby unlocking an enormous payout opportunity worth millions of dollars in total. For example, Defendant Guilmette would have been eligible for equity awards with a grant-date fair value of approximately $6.7 million in RSUs and PRSUs valued as of 2024.[15] Defendant Heaton would have also been eligible for equity awards with a grant-date fair value of approximately $4.25 million in RSUs and PRSUs valued as of 2024.

217. At the very least, the promise of such compensation gave the Individual Defendants a personal financial motive to pay close attention to the stock price and keep it artificially inflated.

218. Additionally, the Individual Defendants' base salaries were dwarfed by the potential value of the stock awards available to them. For example, in 2024, Defendant Guilmette's stock awards were valued at $6,673,339.00, while his base salary was $319,659.00, representing just 4.79% of his total potential compensation. Likewise, Defendant Heaton's stock awards were valued at $4,429,994.00, while his base salary was $492,367.00, representing only 11.11% of his total potential compensation.

### F. The Sudden Departures of the Company's CEO and CFO Support a Strong Inference of Scienter

[15] During the Class Period, Defendant Heaton received 269,001 shares of Alight Class A Common Stock, and Defendant Guilmette received 527,597 shares of Alight Class A Common Stock, each pursuant to the 2021 OIP.

219. That both Alight's CEO and CFO abruptly departed within three weeks of each other and squarely within the six month span between when the Company first began to reveal some of its execution and financial shortfalls and when the Company revealed the full extent of those issues further supports a strong inference of scienter.

220. Despite having served as the Company's CEO for only four quarters, Alight announced in a press release dated November 24, 2025, that Defendant Guilmette "w[ould] step down as CEO and from the Company's Board on December 31, 2025." Unlike his predecessor, Stephan Scholl, who was offered an advisory role with Alight upon his departure, Guilmette was offered no comparable position. Just three weeks later, Alight abruptly announced in a press release dated December 18, 2025, that Defendant Heaton was resigning as CFO to "pursue another opportunity outside of the benefits administration industry," effective January 9, 2026. The Company did not have a viable replacement for Defendant Heaton and instead appointed Greg Giometti as Interim CFO.[16]

221. Defendant Guilmette's and Defendant Heaton's abrupt terminations shortly after Alight's partial corrective disclosure revealed certain execution-related and resulting financial problems, and shortly before Alight disclosed the full extent of those issues, support a strong inference of scienter because it can readily be inferred that these issues led to their terminations.

222. It is equally suspicious that Defendant Heaton resigned before he was scheduled to receive his performance-based stock options pursuant to the 2021 OIP which, according to his

[16] Five months later, on June 4, 2026, Alight announced in a press release that it had appointed Stephen A. Lasher as the Company's new CFO. In announcing the appointment, Alight CEO Verma stated: "Steve is exactly the caliber of financial leader we were looking for — someone with a deep background in financial strategy across the services, technology and B2B sectors, a proven ability to drive transformation at scale, and the kind of operating discipline and investor credibility that Alight needs at this stage of our journey."

Form 4 dated March 4, 2025, would have vested and become exercisable upon the Company's certification on February 19, 2026, that, over the preceding three years, the Company had satisfied the applicable "Performance Conditions"—many of the same performance metrics for which, on that very date, the Company instead reported results below its projections.

### G. The Temporal Proximity Between Defendants' Misstatements And The Relevant Truth Bolsters Scienter

223. The temporal proximity between Defendants' misleading statements and its corresponding truthful disclosures supports scienter.

224. As recently as May 8, 2025, Heaton reaffirmed Alight's full-year guidance, telling investors the Company was "off to a strong start to 2025" and that management was "reaffirming our financial outlook for the year" based on renewal trends that "remain on track," the "continued momentum during this renewal cycle" and the "continue[d] . . . execut[ion] on the day-to-day operations . . . ." Heaton reaffirmed the same guidance on the same call, stating that recurring revenue "performed as expected." Then, on May 14, 2025, Guilmette explained that the Company's organizational changes were enabling it to "execute on [its] strategy" to build out its Employer Solutions business following the Cloud Migration and Divestiture, and that, as a result, the Company could realistically achieve "96% to 98% revenue retention[.]"

225. Less than three months later, however, Alight disclosed a $983 million non-cash goodwill impairment, a net loss of $1,073 million, and reduced full-year guidance. Guilmette attributed the shortfall to two internal causes: expansion deals "taking longer to close" and the admission that "our commercial execution to get deals across the line has not been sufficient."

226. On December 2, 2025, Heaton told investors at the UBS Global Technology and AI Conference that execution had been "tremendous" and the Company felt "really good" about the "operating model and how we're delivering services for clients . . . ." Heaton further touted a

restructured client-management team overseeing the Company's "top 200 clients" to "enabl[e] . . . growth within the white space," and represented that a recently hired Chief Commercial Officer would "drive an inflection" in ARR bookings in 2026.

227. Less than three months later, on February 19, 2026, Alight disclosed a full-year miss, with new CEO Rohit Verma reporting that "new bookings and renewals did not meet our expectations," an additional $803 million goodwill impairment (bringing the year's total to $3.124 billion), and the elimination of its quarterly dividend to reallocate its capital towards other matters such as its increased compensation expenses. Verma attributed the shortfall not to strategy but to "a change in the execution of the company," identifying the "biggest challenge" as "driving operational excellence" and specifically citing continued execution failures in "client management and relationship management" and "technology," the same operating model, client-management structure, bookings pipeline, and technology infrastructure Heaton described as "tremendous," "really good," and primed to "drive an inflection," respectively, only weeks earlier.

## IX. NO SAFE HARBOR

228. The safe harbor provisions for forward-looking statements under the Private Securities Litigation Reform Act of 1995 are applicable only under certain circumstances that do not apply to any of the materially false and misleading statements and omissions alleged in this Complaint.

229. First, many of the identified false and misleading statements and omissions herein are not forward-looking statements, but instead are statements of current or historic fact, or are actionable in context because they omit then-existing material facts.

230. Second, many of the identified false and misleading statements herein were not identified as forward-looking statements.

231. Third, to the extent there were any forward-looking statements that were identified as such at the time made, those statements also contained statements of present or past facts and so are not entitled to protection under the safe harbor.

232. Fourth, to the extent there were any forward-looking statements that were identified as such at the time made, there were no meaningfully cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Such statements were also not accompanied by cautionary language that was meaningful because such warnings or "risk" factors contained in, or incorporated by reference in, the relevant press release, SEC filings, earnings call, or other public statements described herein were general, "boilerplate" statements of risk that would affect any information technology and consulting company, and misleadingly contained no factual disclosure of any of the specific details concerning its revenue, profits, cash position and capitalization or similar important factors that would give investors adequate notice of such risks.

233. Fifth, to the extent there were any such forward-looking statements, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or by reason of what the speaker failed to note, was materially false and/or misleading, and/or that each statement was authorized and/or approved by an executive officer of Alight who actually knew that each such statement was false or misleading when made.

234. For all these same reasons, the bespeaks caution doctrine likewise does not apply to shield Defendants from liability.

## X. LOSS CAUSATION/ECONOMIC LOSS

235. The market for Alight shares was open, well-developed, and efficient at all relevant times. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Alight's common stock and operated as a fraud or deceit on Class Period purchasers of Alight's common stock by materially misleading the investing public. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Alight's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Alight's common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under U.S. federal securities laws.

236. Alight's stock price fell in response to the partial corrective event on August 5, 2025, as alleged *supra*. On August 5, 2025, Defendants disclosed information that was directly related to prior misrepresentations and material omissions concerning Alight's forecasting processes and growth guidance.

237. Notably, on August 5, 2025, Alight announced that its results were faltering below internal expectations with ARR and project revenue both sliding below growth projections and ultimately requiring a revenue guidance cut in part due to management's perceived execution shortfalls of Alight's sales team. Defendants also disclosed the nearly $1 billion goodwill impairment charge, which analysts reported on. None of Alight's competitors reported a goodwill impairment charge.

238. Alight's stock price fell again in response to the final corrective event on February 19, 2026, as alleged *supra*. On February 19, 2026, Defendants disclosed additional information that directly related to their prior and additional misrepresentations and material

omissions concerning Alight's execution and operational shortcomings, their impact on a variety of key financial metrics and the Company's ability to meet management's projections with respect to those metrics, and investors' ability to rely on the consistent returns provided by the Company's dividend. Defendants also disclosed the nearly $1 billion goodwill impairment charge, which analysts reported on. None of Alight's competitors reported a goodwill impairment charge.

239. Specifically, on February 19, 2026, Alight announced "internal financial targets and new bookings and renewals did not meet our expectations, leading us to miss our forecast to the market." Alight further announced a significant adjusted earnings miss due to an "increase in compensation expense," which was described as necessary to drive execution performance among its salesforce. Alight attributed the miss in guidance to issues it had with "execution around operational excellence" including "client management and relationship management . . . technology and . . . continuing to innovate our products and services." Ultimately, by the time of the reveal, Alight was under new management, and they further felt inclined to terminate the Company's dividend, suggesting it was an ineffective method to "drive long-term shareholder value . . . ." The price of Alight stock dropped precipitously from a Class Period high of $8.46 per share to less than $.81 per share.

240. The decline was a direct and proximate result of the nature and extent of Defendants' fraud being revealed to investors and the market. The timing and magnitude of the price decline in Alight shares negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic factors or Alight-specific facts unrelated to Defendants' fraudulent conduct.

241. The economic loss, i.e., damages, suffered by Plaintiffs and other Class members was a direct and proximate result of Defendants' fraudulent scheme to artificially inflate Alight's share price and the subsequent significant decline in the value of Alight shares when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## XI. CLASS ACTION ALLEGATIONS

242. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Alight's common stock during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosure.

243. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have, or had, a controlling interest.

244. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Alight's common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Alight or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to

individually redress the wrongs done to them. Additionally, there will be no difficulty in the management of this action as a class action.

245. Plaintiffs' claims are typical of the claims of the members of the Class, since all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law alleged herein.

246. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

247. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Alight;

(c) whether the Individual Defendants caused Alight to issue false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of Alight's common stock during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

248. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

249. As alleged herein, Plaintiffs will rely, in part, on the presumption of reliance established by the fraud-on-the-market doctrine, inasmuch as Defendants made public misrepresentations or failed to disclose material facts during the Class Period; the misrepresentations and omissions were material and would tend to induce a reasonable investor to misjudge the value of Alight's stock; and Plaintiffs and members of the Class purchased or otherwise acquired Alight's stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

## XII. CONTROL PERSON LIABILITY

250. The Individual Defendants, because of their positions with Alight, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, advertisements, promotional materials, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each Individual Defendant possessed the power to direct or cause the direction of the management and policies of Alight. Each Individual Defendant had a duty to promptly disseminate complete, accurate, and truthful information with respect to Alight's business, operations, and financial condition. Each Individual Defendant was

provided with copies of the Company's SEC filings and press releases alleged herein to be false or misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each Individual Defendant knew or recklessly disregarded that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## XIII. PRESUMPTION OF RELIANCE; FRAUD ON THE MARKET

251. At all relevant times, the market for Alight's common stock was an efficient market, supporting a presumption of reliance under the fraud-on-the-market doctrine for the following reasons, among others:

(a) Alight met the requirements for listing, and was listed and actively traded on the NYSE under the ticker symbol "ALIT", a highly efficient and automated market;

(b) Alight had approximately 524.1 million shares outstanding as of February 17, 2026 such its stock was liquid. During the Class Period, numerous shares of Alight stock were traded on a daily basis, with moderate to heavy volume, demonstrating an active and broad market for Alight stock and permitting a strong presumption of an efficient market;

(c) As a regulated issuer, Alight filed periodic public reports with the SEC;

(d) Alight regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e) Alight was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

(f) Unexpected material news about Alight was reflected in and incorporated into the Company's stock price during the Class Period; and

(g) As a result of the foregoing, the market for Alight's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Alight's stock price. Under these circumstances, all purchasers of Alight's common stock during the Class Period suffered similar injury through their purchase of Alight's common stock at artificially inflated prices, and a presumption of reliance applies.

252. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 153 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## XIV. CAUSES OF ACTION

### COUNT I

### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants

253. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

254. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

255. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Alight common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Alight's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

256. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Alight's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

257. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

258. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Alight's internal affairs.

259. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Alight's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Alight's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Alight's common

stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

260. During the Class Period, Alight's common stock was traded in an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Alight's common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Alight's common stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Alight's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

261. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

262. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

## Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

263. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

264. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Alight's misstatements.

265. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Alight which had become materially false or misleading.

266. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Alight disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Alight to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Alight's common stock.

267. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Alight to engage in the unlawful acts and conduct complained of

herein. Each of the Individual Defendants exercised control over the general operations and business of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

268. By reason of the above conduct, the Individual Defendants and/or Alight are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury on all triable claims.

Dated: August 6, 2026

By: */s/ James M. Wilson, Jr.*
James M. Wilson, Jr.

James M. Wilson, Jr. (admitted *pro hac vice*)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor

New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email: jwilson@faruqilaw.com

Robert W. Killorin (admitted *pro hac vice*)
**FARUQI & FARUQI, LLP**
3565 Piedmont Road NE Building Four
Suite 380
Atlanta, GA 30305
Telephone: 404-847-0617
Facsimile: 404-506-9534
Email: rkillorin@faruqilaw.com

*Attorneys for Lead Plaintiff Mushtaq Pyaru and Lead Counsel for the putative Class*

Marvin A. Miller
Lori A. Fanning
**MILLER LAW LLC**
53 W. Jackson Blvd., Suite 1320
Chicago, IL 60604
Telephone: 312-332-3400
Facsimile: 312-676-2676
Email: mmiller@millerlawllc.com
lfanning@millerlawllc.com

*Attorneys for Lead Plaintiff Mushtaq Pyaru and Liaison Counsel for the putative Class*

Evan J. Kaufman
**ROBBINS GELLER RUDMAN & DOWD LLP**
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631-367-7100
Email: ekaufman@rgrdlaw.com

*Attorneys for Additional Plaintiff Warren Police and Fire Retirement System*

# CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Mushtaq Pyaru, declare as to the claims asserted under the federal securities laws against Alight, Inc., *et al*, that:

1. I have reviewed a complaint against Alight, Inc., *et al* in the action filed and adopt the allegations therein.

2. I have selected and retained Faruqi & Faruqi, LLP as counsel for purposes of prosecuting this action and claims against the defendants.

3. I did not purchase any security that is the subject of this action at the direction of my counsel or in order to participate in any private action arising under the federal securities laws.

4. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5. My transactions in Alight, Inc., securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6. In the past three years, I have not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws.

7. I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Dated 05/11/2026

Signed Mushtaq Pyaru
Mushtaq Pyaru (May 11, 2026 14:05:42 CDT)
Mushtaq Pyaru

### Individual Account

| Transaction (Purchase or Sale) | Share Type | Trade Date | Quantity | Price Per Share |
|---|---|---|---|---|
| Purchase | Common Stock | 9/2/2025 | 35,000 | $3.8300 |
| Purchase | Common Stock | 9/2/2025 | 3,000 | $3.8000 |
| Purchase | Common Stock | 9/9/2025 | 33,513 | $3.7000 |

### 401(k) Account

| Transaction (Purchase or Sale) | Share Type | Trade Date | Quantity | Price Per Share |
|---|---|---|---|---|
| Purchase | Common Stock | 9/2/2025 | 1,872 | $3.8050 |
| Purchase | Common Stock | 9/2/2025 | 73,128 | $3.8100 |
| Purchase | Common Stock | 9/8/2025 | 6,698 | $3.6850 |
| Purchase | Common Stock | 9/8/2025 | 18,883 | $3.6900 |
| Dividend Reinvestment | Common Stock | 12/12/2025 | 1,874.064 | $2.1468 |

CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

City of Warren Police and Fire Retirement System ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing. Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

5. Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Zornberg v. NAPCO Security Technologies, Inc.*, No. 1:23-cv-06465 (E.D.N.Y.)
*Munch v. Sprout Social, Inc.*, No. 1:24-cv-03867 (N.D. Ill.)

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 14th day of May, 2026.

City of Warren Police and Fire Retirement System

By:

Its: Chairman

ALIGHT

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Common Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 11/12/2024 | 4,404 | $8.46 |
| 11/12/2024 | 6,556 | $8.65 |
| 11/13/2024 | 1,479 | $8.43 |
| 02/21/2025 | 19,150 | $6.88 |
| 03/12/2025 | 5,680 | $6.11 |
| 04/04/2025 | 9,830 | $4.87 |
| 05/21/2025 | 6,735 | $5.62 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 01/10/2025 | 19,558 | $6.44 |
| 08/05/2025 | 12,080 | $4.35 |
| 08/07/2025 | 7,030 | $4.00 |
| 08/08/2025 | 3,100 | $3.90 |
| 08/08/2025 | 4,030 | $3.89 |
| 08/11/2025 | 3,650 | $3.84 |
| 08/14/2025 | 11,505 | $3.68 |

Prices listed are rounded to two decimal places.

*Opening position of 7,119 shares.